**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JAMES WILLIAM WHITE,

      Defendant - Appellant.

No. 14-7031

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 6:13-CR-00054-RAW-1)**

Carl Folsom, III, Assistant Federal Public Defender (Julia L. O'Connell, Federal Public Defender, with him on the brief), Muskogee, Oklahoma, for Appellant.

Edward Snow, Assistant United States Attorney (Mark F. Green, United States Attorney, and Linda A. Epperley, Assistant United States Attorney, with him on the brief), Muskogee, Oklahoma, for Appellee.

Before **KELLY, LUCERO,** and **McHUGH,** Circuit Judges.

**McHUGH**, Circuit Judge.

## I.  INTRODUCTION

James White is a convicted sex offender who failed to keep his registration current after he moved from Oklahoma to Texas. He entered a conditional guilty plea admitting to violating the Sex Offender Registration and Notification Act (SORNA), 18 U.S.C. § 2250(a), but reserving five issues for appeal. Three are challenges to his conviction on the grounds that SORNA violates the Commerce Clause, the Tenth Amendment, and the Ex Post Facto Clause of the U.S. Constitution. Next, Mr. White attacks his sentence, claiming the district court erred: (1) by calculating his Sentencing Guidelines range as if he were a tier III sex offender; and (2) by imposing special conditions of supervised release limiting his contact with his minor grandchildren and nieces. We hold that SORNA is the product of a valid exercise of Congress's Commerce Clause power, and that it does not violate the Tenth Amendment or the Ex Post Facto Clause. But we conclude the district court erred in classifying Mr. White as a tier III sex offender and vacate Mr. White's sentence and conditions of supervised release. We therefore affirm Mr. White's conviction but remand to the district court for resentencing.

## II. BACKGROUND

Mr. White took indecent liberties with a child in North Carolina on February 6, 2005, in violation of section 14-202.1 of the North Carolina Criminal Code. On July 27, 2006, Congress passed the Sex Offender Registration and Notification Act (SORNA). Mr. White was indicted by the State of North Carolina on December 11, 2006, and convicted on February 14, 2007. On February 28, 2007, two weeks after Mr. White's

conviction, the U.S. Attorney General issued a rule extending the requirements of SORNA "to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act." 28 C.F.R. § 72.3. Thus, although Mr. White committed his sex offense before SORNA was enacted, he is required to comply with its registration requirements.

In 2013, Mr. White moved from Oklahoma to Texas without registering in Texas or updating his Oklahoma sex offender registration as mandated by SORNA. He was subsequently indicted in Oklahoma for failing to register as a sex offender, in violation of 18 U.S.C. § 2250(a)(1), (a)(2)(B), and (a)(3).

Mr. White moved to dismiss the indictment, arguing that SORNA violates the Commerce Clause, the Tenth Amendment, and the Ex Post Facto Clause. The district court denied Mr. White's motion to dismiss and Mr. White entered a conditional guilty plea, reserving his right to appeal both the denial of his motion to dismiss and his sentence.

Prior to sentencing, the probation office prepared a Presentence Investigation Report (PSR). The PSR treated Mr. White as a "tier III" sex offender under 42 U.S.C. § 16911, giving him a base offense level of 16. U.S.S.G. § 2A3.5; *see* 42 U.S.C. § 16911 (defining tier I, tier II, and tier III sex offenders). It then credited Mr. White with acceptance of personal responsibility for the offense and assigned him a three-level

reduction pursuant to U.S.S.G. § 3E1.1(a) and (b).[1] Based on these assumptions, the PSR

calculated Mr. White's total offense level at 13. Mr. White's prior criminal history placed

him in criminal history category III, which when combined with his offense level,

resulted in a United States Sentencing Guidelines (Guidelines) range of 18 to 24 months

of imprisonment.

Mr. White objected to the PSR, arguing he qualified as a "tier I" sex offender, not

a "tier III" sex offender. If Mr. White is correct, his base offense level would be 12 and

his total offense level 10. Combined with his criminal history category of III, these

revised numbers would result in a Guidelines sentencing range of 10 to 16 months'

imprisonment.

At the sentencing hearing, the district court overruled Mr. White's objection to his

tier classification. In reaching its conclusion that Mr. White qualifies as a tier III sex

offender, the district court relied on allegations in the state indictment and documents

from the state prosecution indicating that the victim was the seven-year-old daughter of

Mr. White's girlfriend and that the incident involved contact between the victim and Mr.

White. Based on these facts, the district court held Mr. White's state offense was

comparable to the federal crime of abusive sexual contact against a minor under thirteen,

thereby placing him within the tier III category. *See* 42 U.S.C. § 16911 (defining tier III

---

[1] U.S.S.G. § 3E1.1 authorizes a two-level reduction for acceptance of responsibility, or a three-level reduction if the base offense level is 16 or higher and the defendant assists the prosecution by timely notifying it of his intention to plead guilty.

sex offenders by comparing their sex offenses to enumerated federal crimes). The district court then sentenced Mr. White at the low end of the Guidelines range, to 18 months' imprisonment.

The district court also imposed special conditions of supervised release. The third special condition prohibited Mr. White from "be[ing] at any residence where children under the age of 18 are residing without the prior written permission of the U.S. Probation Office." The fourth special condition prohibited Mr. White from "be[ing] associated with children under the age of 18 except in the presence of a responsible adult who is aware of the defendant's background and current offense, and who has been approved by the U.S. Probation Officer."

Mr. White objected to the third and fourth special conditions of supervised release, claiming they were a greater deprivation of liberty than necessary. In particular, he objected to the condition's infringement on access to his minor grandchildren and nieces. Mr. White also objected to the special conditions on the ground the district court had unconstitutionally delegated the judiciary's Article III sentencing power to the probation officer. The district court overruled each of Mr. White's objections to the special conditions.

Mr. White now appeals from his conviction and from his sentence for the same reasons advanced in the district court.

## III. DISCUSSION

We begin our analysis by addressing Mr. White's claims that his conviction should be overturned because SORNA violates the U.S. Constitution. We then consider his challenges to the sentence and the conditions of supervised release.

### A. *The Constitutionality of SORNA*

We review the district court's denial of Mr. White's motion to dismiss the indictment on constitutional grounds de novo. *See United States v. Brune*, 767 F.3d 1009, 1015 (10th Cir. 2014). "As a part of our de novo review, however, we must presume that the statute is constitutional." *Id.* (internal quotation marks omitted). We may "invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000).

### 1. The Commerce Clause

Mr. White first claims his conviction violates the Commerce Clause. Although he acknowledges that we rejected a Commerce Clause challenge to SORNA in *United States v. Hinckley.* 550 F.3d 926, 939–40 (10th Cir. 2008), *abrogated on other grounds by Reynolds v. United States*, 132 S. Ct. 975 (2012), Mr. White argues that our decision has been superseded by subsequent authority from the United States Supreme Court.[2] Specifically, he contends the Supreme Court's decision in *National Federation of*

---

[2] Although typically, one panel of this court cannot overrule the judgment of another panel, we may do so if an intervening decision from the Supreme Court invalidates our previous analysis. *See United States v. Brooks,* 751 F.3d 1204, 1209 (10th Cir. 2014).

*Independent Businesses v. Sebelius*, 132 S. Ct. 2566 (2012) (*NFIB*), calls into question

our decision in *Hinckley*. For the following reasons, we disagree.

To put our analysis in context, we begin with an overview of the Commerce

Clause and our application of that jurisprudence in *Hinckley*. Next, we discuss the

Supreme Court's decision in *NFIB* and explain why it is not controlling of the Commerce

Clause issue presented here.

The Constitution authorizes Congress to "regulate Commerce with foreign

Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art I, § 8,

cl. 3. The Supreme Court has identified three areas that Congress may regulate under the

Commerce Clause: (1) "the channels of interstate commerce," (2) "persons or things in

interstate commerce," and (3) "those activities that substantially affect interstate

commerce." *NFIB*, 132 S. Ct. at 2578; *United States v. Lopez*, 514 U.S. 549, 558 (1995);

*see also United States v. Morrison*, 529 U.S. 598, 608–09 (2000).

The bounds of Congress's power to regulate the third field—activities that

substantially affect interstate commerce—have been defined by the Supreme Court

jurisprudence. In *Lopez*, the Court struck down a federal statute prohibiting possession of

a gun in a school zone because the activity regulated was purely intrastate and was not an

economic activity which substantially affected interstate commerce. 514 U.S. at 561–63.

Five years later, the Court struck down provisions of the Violence Against Women Act

providing a federal civil remedy for victims of gender-motivated violence for the same

reasons: the regulated violence was purely intrastate and it did not substantially affect

interstate commerce. *Morrison*, 529 U.S. at 609–612. In both cases, the Supreme Court considered it significant that neither statute contained an express jurisdictional element requiring some connection with interstate commerce. *Id.* at 611–12, *Lopez*, 514 U.S. at 562.

In our decision in *Hinckley,* the defendant relied on *Lopez* and *Morrison* to argue that Congress could not criminalize his failure to register as a state sex offender because there was nothing inherent in being a state sex offender that substantially affected interstate commerce. 550 F.3d at 940. We distinguished the statutes at issue in *Lopez* and *Morrison* because they related solely to intrastate activity which could be regulated only if it fell within the third *Lopez* category by "substantially affect[ing] interstate commerce," *Lopez*, 514 U.S. at 559. *Hinckley*, 550 F.3d at 940. In contrast, SORNA "comprises two elements: post-SORNA failure to register coupled with interstate travel." *Id.* Thus, Congress's authority to regulate the activity covered by SORNA is confirmed by the first and second prongs of *Lopez,* which regulate the "channels of interstate commerce" and "persons or things in interstate commerce." *Lopez*, 514 U.S. at 558. In *Hinckley*, we held Congress could act "to keep the channels of interstate commerce free from immoral and injurious uses." *Id.* (internal quotation marks omitted). Mr. White asks us to reconsider that decision in light of *NFIB*.

The plaintiffs in *NFIB* challenged the Patient Protection and Affordable Care Act (PPACA), arguing that its individual mandate, which requires individuals to purchase a health insurance policy providing a minimum level of coverage, was unconstitutional.

132 S. Ct. at 2577. In a splintered decision, the Court upheld the PPACA under Congress's tax power, but at least five justices also concluded the PPACA violated the Commerce Clause. *Compare id.* at 2585–91 (Roberts, C.J., concluding that the PPACA was not a valid exercise of the Commerce Clause), *and id.* at 2645–48 (Scalia, J., joined by Kennedy, J., Thomas, J., and Alito, J., dissenting on taxation power grounds, but agreeing that the PPACA was not authorized by the Commerce Clause), *with id.* at 2615–25 (Ginsburg, J., concurring in part and dissenting in part, and joined by Sotomayor, J., Breyer, J., and Kagan, J., who all agreed the PPACA was constitutional under the Commerce Clause).[3]

All of the justices focused their discussion of the Commerce Clause on the third *Lopez* prong and addressed whether the individual mandate was a valid regulation of intrastate activity that substantially affects interstate commerce. Chief Justice Roberts

---

[3] As the Eighth Circuit has noted, *NFIB* provides, "no controlling opinion on the issue of whether provisions of the Affordable Care Act violated the Commerce Clause." *United States v. Anderson*, 771 F.3d 1064, 1068 n.2 (8th Cir. 2014); *see also United States v. Robbins*, 729 F.3d 131, 135 (2d Cir. 2013) ("It is not clear whether anything said about the Commerce Clause in *NFIB*'s primary opinion—that of Chief Justice Roberts— is more than dicta, since Part III-A of the Chief Justice's opinion was not joined by any other Justice and, at least arguably, discussed a bypassed alternative, rather than a necessary step, in the Court's decision to uphold the Act."). Ordinarily we would apply the opinion of Chief Justice Roberts because his opinion articulated the narrowest grounds for upholding the individual mandate. *Id.*; *see Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (internal quotation marks omitted)). But because none of the opinions in *NFIB* affect our analysis in *Hinckley*, we leave for another day the precise scope of *NFIB*'s holding.

explained that the Constitution only provides Congress with the power to regulate

commerce, which "presupposes the existence of commercial activity to be regulated." *Id.*

at 2586 (opinion of Roberts, C.J.). He concluded the individual mandate did not regulate

existing activity, but compelled individuals to become active in commerce by purchasing

health insurance. *Id.* at 2587. Because he concluded the law did not, in the first instance,

regulate commercial activity or any activity which substantially affects interstate

commerce, the Chief Justice concluded it was unsupported by the Commerce Clause. *Id.*

Justice Scalia, joined by Justices Kennedy, Thomas, and Alito, agreed the

individual mandate could not be supported by Congress's power to regulate activities that

substantially affect interstate commerce. *Id.* at 2647–48 (Scalia, J., dissenting). He noted

that the mandate does not apply to persons who purchase health care services or goods,

but instead forces persons who are not participants in the relevant health care market to

join the market. *Id.* Like Chief Justice Roberts, Justice Scalia drew a distinction between

activity and inactivity. *Id.* at 2649. As nonparticipants are, by definition, inactive in

commerce, he concluded their activity cannot have a substantial effect on commerce. *Id.*

at 2647–48.[4]

---

[4] Justice Ginsburg, joined by Justices Sotomayor, Breyer, and Kagan, would have upheld Congress's exercise of the commerce power because Congress had a rational basis for concluding that the uninsured substantially affect interstate commerce. *National Federation of Independent Businesses v. Sebelius*, 132 S. Ct. 2566, 2616–18 (2012) (Ginsburg, J., concurring in part and dissenting in part). Justice Ginsburg reasoned the decision to forgo insurance was not inactivity but rather an economic choice that Congress has the constitutional power to regulate. *Id.* at 2617. While she disagreed with

Continued . . .

Mr. White claims SORNA regulates inactivity by compelling state sex offenders to act and is therefore unconstitutional under the Supreme Court's analysis in *NFIB*. We are not convinced. First, the provision of the PPACA at issue in *NFIB* implicated only the third prong of *Lopez*, the power to regulate intrastate activity that substantially affects interstate commerce. In *Hinckley*, we upheld SORNA as a valid exercise of Congress's power under the first and second *Lopez* prongs: regulation of channels of interstate commerce and regulation of persons in interstate commerce. 550 F.3d at 940. And we concluded that "whether such an activity has a substantial effect on interstate commerce is irrelevant." *Id.* Thus, *NFIB*'s discussion of the limits of Congress's power to regulate intrastate activity based solely on its effect on interstate commerce does nothing to undermine our analysis in *Hinckley*.

Second, even assuming the Commerce Clause discussion in *NFIB* is a holding and that it is relevant to SORNA, Mr. White's conviction was not based solely on his inactivity. Instead, it is based on his interstate activity—moving from Oklahoma to Texas. But Mr. White argues SORNA should be evaluated solely under the third prong of *Lopez* because his status as a sex offender is a purely intrastate matter. In doing so, Mr.

_____
Cont.

the Chief Justice and the dissenters' view that there is a constitutional difference between commercial activity and commercial inactivity, Justice Ginsburg maintained that the decision to self-insure is "an economic act with the requisite connection to interstate commerce." *Id.* at 2621–24. Accordingly, she would have upheld the PPACA as a valid exercise of Congress's commerce power.

-11-

White attempts to sever SORNA's registration provision from its enforcement provision, and then argues SORNA lacks an interstate element. *See* 42 U.S.C. § 16913 (registration requirement);18 U.S.C. § 2250 (enforcement provision). This argument is unavailing. In *United States v. Lawrance*, we held that when reviewing SORNA's federal registration requirements as applied to state sex offenders like Mr. White, we consider both its regulatory and enforcement provisions. 548 F.3d 1329, 1336–37 (10th Cir. 2008). If, taken together, they are a valid exercise of the commerce power, we must uphold the statute. *Id.*

SORNA uses a combination of civil and criminal components to achieve its goal of keeping track of sex offenders. *See Carr v. United States*, 560 U.S. 438, 455 (2010) ("Section 2250 is not a stand-alone response to the problem of missing sex offenders; it is embedded in a broader statutory scheme enacted to address the deficiencies in prior law that had enabled sex offenders to slip through the cracks."). The statute's civil component—42 U.S.C. § 16913—"requires all sex offenders to register." *United States v. Carel*, 668 F.3d 1211, 1213 (10th Cir. 2011) (internal quotation marks omitted). In turn, "SORNA's criminal provision—18 U.S.C. § 2250(a)—imposes criminal penalties for failing to comply with § 16913's registration requirement," *id.*, only if a state sex offender "travels in interstate or foreign commerce, or enters or leaves, or resides in Indian country," 18 U.S.C. § 2250(a)(1)(B). Taking these provisions together, SORNA contains an express jurisdictional element requiring interstate travel. *See Morrison*, 529 U.S. at 611–12; *Lopez*, 514 U.S. at 562.

-12-

Mr. White moved from Oklahoma to Texas without updating his registration, and drove back to Oklahoma every ninety days to maintain the illusion that he continued to reside there. As Mr. White's behavior illustrates, §§ 16913 and 2250(a) directly regulate activity, specifically activity involving the interstate movement of persons and activity that employs the channels of interstate commerce. Accordingly, SORNA is a proper exercise of Congress's Commerce Clause power under the first and second *Lopez* prongs. That was our conclusion in *Hinckley*, and nothing in *NFIB* causes us to doubt the continuing validity of that decision.[5]

## 2. The Ex Post Facto Clause

Mr. White next argues SORNA's requirement that pre-Act sex offenders register violates the Ex Post Facto Clause by increasing the punishment for a past offense. *See* U.S. Const. art. I, § 9, cl. 3. We squarely addressed this issue in *United States v. Lawrance*, 548 F.3d 1329 (10th Cir. 2008), and upheld SORNA because it is a regulatory statute and any criminal penalties attach only to future failures to register. *Id.* at 1332-36.

---

[5] Our conclusion is consistent with that of every federal circuit to have considered the issue since the Supreme Court's decision in *NFIB*. *See United States v. Anderson*, 771 F.3d 1064, 1070–71 (8th Cir. 2014) (upholding SORNA as a valid exercise of the Commerce Clause combined with the Necessary and Proper Clause); *United States v. Cabrera-Gutierrez*, 756 F.3d 1125, 1129–32 (9th Cir. 2013) (holding that SORNA does not regulate inactivity); *United States v. Robbins*, 729 F.3d 131, 134–36 (2d Cir. 2013) (same); *United States v. Rivers*, 588 F. App'x 905, 907–909 (11th Cir. 2014) (unpublished) (holding that *NFIB* does not say anything about a statute like SORNA which falls within the first two *Lopez* prongs and is triggered by activity in the form of interstate travel).

Mr. White contends *Lawrance* was wrongly decided in the first instance and that we should reconsider the issue in light of a growing number of state courts holding that state registration schemes violate the Ex Post Facto Clause. But we are bound by the holding in *Lawrance*. "[O]ne panel of this court cannot overrule the judgment of another panel absent en banc consideration or an intervening Supreme Court decision that is contrary to or invalidates our previous analysis." *Nichols*, 775 F.3d 1225, 1230 (10th Cir. 2014) (alterations and internal quotation marks omitted). Mr. White does not claim that either exception to the horizontal stare decisis rule is present here and even acknowledged at oral argument that he raised the issue solely to preserve it for possible en banc reconsideration or review by the United States Supreme Court. We therefore affirm the district court on this issue.

## 3. The Tenth Amendment

As the last constitutional challenge to his conviction, Mr. White argues SORNA violates the Tenth Amendment by directing state officials to implement a federally mandated sex offender registry. The Tenth Amendment provides that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend X. Under the Tenth Amendment, federal officers may not conscript or commandeer state officials into administering and enforcing a federal regulatory program. *Printz v. United States*, 521 U.S. 898, 935 (1997). In particular, the "Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or

those of their political subdivisions, to administer or enforce a federal regulatory provision." *Id.*

Notwithstanding this general principle, Congress may constitutionally obtain state cooperation with a federal program by conditioning federal funding on state implementation of a federal mandate. *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000); *see also South Dakota v. Dole*, 483 U.S. 203, 206–08 (1987) (same). These arrangements are a constitutional exercise of the spending power so long as (1) the spending or withholding is in the pursuit of "the general welfare"; (2) the conditional nature is clear and "unambiguous[]"; (3) the condition is rationally related to the purpose of the federal interest, program, or funding; and (4) the condition does not require conduct that is barred by the [C]onstitution itself. *Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 717 (10th Cir. 2004); *see also United States v. Felts*, 674 F.3d 599, 608 (6th Cir. 2012). Congress has set up such a scheme in SORNA, by asking states to implement SORNA in exchange for 10% of federal funding under the Omnibus Crime Control and Safe Streets Act of 1968. 42 U.S.C. §§ 16924, 16925(a).

Mr. White does not claim Congress exceeded its spending power. Instead, he argues SORNA violates the Tenth Amendment by requiring Oklahoma officials to comply with federal sex offender registration even though Oklahoma has not implemented SORNA or accepted conditional funding. Mr. White relies on the website of the Office of Sex Offender Sentencing, Monitoring, Registering, and Tracking (SMART), which indicates Oklahoma is not among the states that have substantially implemented

-15-

SORNA. SORNA, SMART, http://ojp.gov/smart/sorna.htm (last visited 3/9/2015). He asks us to infer from the fact of his conviction, and the lack of a federally run system for registering sex offenders, that Oklahoma officials are forced to administer the federal registration program even though the state has not implemented SORNA. But he has not identified any federal statutory provisions that compel an Oklahoma official to act if the state refuses federal funding, and we decline Mr. White's invitation to make such an inference.

As the Fourth Circuit explained, "while SORNA imposes a duty *on the sex offender* to register, it nowhere imposes a requirement *on the State* to accept such registration." *Kennedy v. Allera*, 612 F.3d 261, 269 (4th Cir. 2010); *see also Felts*, 674 F.3d at 602 ("Congress through SORNA has not commandeered Tennessee, nor compelled the state to comply with its requirements. Congress has simply placed conditions on the receipt of federal funds. A state is free to keep its existing sex-offender registry system in place (and risk losing funding) or adhere to SORNA's requirements (and maintain funding)."). We join all of the federal circuits to have considered this issue in holding that SORNA does not violate the Tenth Amendment. *See United States v. Richardson*, 754 F.3d 1143, 1146–47 (9th Cir. 2014); *United States v. Smith*, 655 F.3d 839, 848 (8th Cir. 2011), *vacated on other grounds by Smith v. United States*, 132 S. Ct.

2712 (2012) (mem.);[6] *United States v. Johnson*, 632 F.3d 912, 920 (5th Cir. 2011);

*United States v. Guzman*, 591 F.3d 83, 94 (2d Cir. 2010).[7]

In summary, we reject Mr. White's claims that SORNA violates the Commerce Clause, the Ex Post Facto Clause, and the Tenth Amendment of the U.S. Constitution. Because we uphold the statute, we also affirm Mr. White's conviction for failing to comply with SORNA's registration requirements. We now address Mr. White's challenges to his sentence.

### *B. Sentencing*

Mr. White has appealed two issues related to his sentence. First, he argues the district court improperly classified him as a tier III sex offender, which resulted in an inaccurate calculation of his Guidelines sentencing range. Second, he challenges the conditions of supervised release imposed by the district court as an unconstitutional interference with his right of familial association and as an unconstitutional delegation of sentencing authority to the probation officer.

---

[6] The Eighth Circuit's decision in *United States v. Smith*, 655 F.3d 839, 848 (8th Cir. 2011) was vacated by the Supreme Court with instructions to reconsider it in light of *Reynolds v. United States*, 132 S. Ct. 975 (2012). *Smith v. United States*, 132 S. Ct. 2712 (2012) (mem.). On remand, the Eighth Circuit determined that *Reynolds* did not affect its Tenth Amendment analysis and reinstated that portion of the opinion. *United States v. Smith*, 504 F. App'x 519, 520 (8th Cir. 2012) (unpublished).

[7] The Second Circuit did not cleanly decide this issue because of problems with the defendant's briefing. *See United States v. Guzman*, 591 F.3d 83, 94 (2d Cir. 2010). Still, the Second Circuit held that the defendant's Tenth Amendment challenge to SORNA had failed.

For the reasons discussed below, we agree that Mr. White should have been classified as a tier I sex offender, and we therefore vacate his sentence and remand for further proceedings. Because we vacate Mr. White's sentence, we also vacate the conditions of his supervised release. But to assist the district court when it considers whether conditions of supervised release are appropriate upon resentencing, we provide guidance on the constitutionality of the challenged conditions. *See Fletcher v. United States*, 730 F.3d 1206, 1214 (10th Cir. 2013) (holding that district court erred in dismissing case and giving guidance on issue that "[s]trictly speaking, we may not have to reach," to provide the district court and the parties guidance on remand).

## 1. Guidelines Sentencing Range

We review sentences imposed by the district court under the abuse of discretion standard. *See Gall v. United States*, 552 U.S. 38, 51 (2007). A district court exceeds its discretion when it imposes a sentence that is "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Munoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008). When reviewing a sentence for reasonableness, we engage in a two-step process which examines both procedural and substantive reasonableness. *See Gall*, 552 U.S. at 51; *United States v. Verdin-Garcia*, 516 F.3d 884, 895 (10th Cir. 2008). We "must first ensure that the district court committed no significant procedural error," which could include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—

including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51 (internal quotation marks omitted); *see also United States v. Shuck*, 713 F.3d 563, 571 (10th Cir. 2013) (affirming a sentence that was both procedurally and substantively reasonable). In examining a sentence for procedural reasonableness, "we review the district court's legal conclusions *de novo* and its factual findings for clear error." *Shuck*, 713 F.3d at 570; *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006).

Mr. White claims his sentence is procedurally unreasonable because the district court inaccurately calculated his Guidelines range. To determine whether he is correct, we first explain the significance of Mr. White's tier classification to the determination of his sentencing range. Next we address SORNA's sex offender tier classifications and the proper methodology for deciding whether a sex offender falls within a particular tier. Finally, we apply that methodology to Mr. White and conclude that he does not qualify as a tier III sex offender.

*a. The importance of tier classifications for sentencing under the Guidelines*

Under the Guidelines, a defendant's sentencing range is determined by a number of factors, including his offense level and criminal history. For defendants like Mr. White who are being sentenced for failure to register as sex offenders, the offense level is dictated by the defendant's sex offender tier classification under SORNA, 42 U.S.C.

§ 16911,[8] U.S.S.G. § 2A3.5 & cmt. SORNA classifies sex offenders into three tiers depending on the seriousness of their underlying sex offense. Section 2A3.5 of the Guidelines sets a defendant's base offense level at 16 if the defendant was required to register as a tier III offender, 14 if the defendant was required to register as a tier II offender, or 12 if the defendant was required to register as a tier I offender.[9] The district court adopted the PSR's classification of Mr. White as a tier III sex offender and the PSR's use of the corresponding base level of 16 to calculate Mr. White's recommended Guidelines range of 18 to 24 months' imprisonment. If Mr. White is correct that he qualifies only as a tier I sex offender, his offense level would fall to 12 and his Guidelines sentencing range would drop to 10 to 16 months' imprisonment. Thus, because a defendant's tier classification directly impacts the Guidelines sentence calculation, we must determine whether the district court correctly assigned Mr. White to tier III.

---

[8] The Guidelines do not define sex offender tier classifications, but rather incorporate SORNA's classifications through the Guidelines' commentary. *Cf. United States v. Lucero*, 747 F.3d 1242, 1247 (10th Cir. 2014) (holding the commentary issued by the Sentencing Commission is binding and "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").

[9] In addition to determining a SORNA violator's base offense level, a sex offender's tier classification determines the length of his SORNA registration obligation. 42 U.S.C. § 16915(a). Tier I offenders must register for 15 years after being convicted of a sex offense; tier II offenders must register for 25 years; and tier III offenders must register for life. *Id.* The tier classification also determines how often an offender is required to register. *Id.* § 16916.

*b. Determining a defendant's tier classification under SORNA*

Under SORNA, a defendant's tier classification is determined by comparing the defendant's prior sex offense to statutory criteria. For example, if Mr. White's prior offense "is comparable to or more severe than [the federal crime of]. . . (i) aggravated sexual abuse or sexual abuse . . . ; or (ii) abusive sexual contact . . . against a minor who has not attained the age of 13 years," he was appropriately classified as a tier III sex offender.[10] 42 U.S.C. § 16911(4)(A). But if he does not qualify as a tier III sex offender, he will be classified as a tier II sex offender if, as relevant here, his underlying offense is "comparable to or more severe than [the federal crime of] . . . (iv) abusive sexual contact," irrespective of the victim's age. *Id.* at § 16911(3)(A)(iv). And a sex offender who qualifies as neither a tier III nor a tier II sex offender is a tier I sex offender. *Id.* at § 16911(4)(C).

Our review of Mr. White's tier classification is complicated by the fact that the term "offense" as used in 42 U.S.C. § 16911 is ambiguous. In *Nijhawan v. Holder*, the Supreme Court explained that Congress's use of the words "'crime,' 'felony,' 'offense,' and the like sometimes refer[s] to a generic crime, say, the crime of fraud or theft in general, and sometimes refer[s] to the specific acts in which an offender engaged on a specific occasion, say, *the* fraud that the defendant planned and executed last month." 557

---

[10] There are other ways in which a sex offender can be classified as a tier II or tier III sex offender, but they are not relevant here and we do not discuss them. *See* 42 U.S.C. § 16911(3), (4).

U.S. 29, 34–35 (2009). This distinction is significant because comparing a generic

offense to a federal crime involves a different methodology than comparing the

defendant's specific acts to that federal crime. Thus, the task before us is to determine

whether the term "offense" in § 16911 refers to the generic crime or to a defendant's

specific conduct.

SORNA is not alone in requiring courts to engage in some form of comparison

between a defendant's prior conviction and criteria set forth in a federal statute. For

example, Congress has required courts to engage in such comparisons in the context of

sentencing enhancements under the Armed Career Criminal Act (ACCA)[11] and in the

context of deportability under the Immigration and Nationality Act (INA).[12] When

Congress has required such comparisons, courts employ two main approaches, depending

on whether Congress referenced a generic crime or a defendant's specific conduct: the

categorical approach and the circumstance-specific approach.

If a statute refers to the generic crime, courts apply "what has become known as

the 'categorical approach': They compare the elements of the statute forming the basis of

the defendant's conviction with the elements of the [predicate] crime." *Descamps v.*

---

[11] 18 U.S.C. § 924(e)(2)(B)(ii) (requiring courts to compare a defendant's prior conviction to "burglary, arson, or extortion" to determine if the prior conviction qualifies as a violent felony under the ACCA).

[12] 8 U.S.C. § 1101(a)(43)(M)(i) (defining an "aggravated felony" as "an offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeds $10,000").

*United States*, 133 S. Ct. 2276, 2281 (2013); *cf. United States v. Dennis*, 551 F.3d 986, 991 (10th Cir. 2008) (applying the categorical approach to determine whether an indecent liberties-with-a-minor conviction was a crime of violence for an ACCA enhancement, and rejecting a "categorical-plus" approach that allowed consideration of conduct stated in the charging documents). Under the categorical approach, courts will look beyond the elements of the defendant's previous offense only when the statute under which the defendant was convicted is divisible.

A "divisible statute" is one that "sets out one or more elements of the offense in the alternative." *Descamps*, 133 S. Ct. at 2281. For example, if the defendant's prior conviction was under a statute that criminalizes several types of activity, not all of which fall within the criteria listed in the federal statute, the court cannot determine whether the defendant's commission of the underlying offense is comparable to the federal statute's criteria without more information. *E.g.*, *United States v. Castleman*, 134 S. Ct. 1405, 1414 (2014) (holding that Tennessee domestic assault statute was divisible because not all acts criminalized by it required the use or attempted use of physical force, an element necessary to constitute a "misdemeanor crime of domestic violence" for purposes of 18 U.S.C. § 922(g)(9)); *Shepard v. United States*, 544 U.S. 13, 17 (2005) (holding that the Massachusetts burglary statute was divisible because it covered entries into boats and cars, as well as buildings, and burglary as a predicate violent felony under the Armed Career Criminal Act was limited to entries into a building or structure). When faced with these divisible statutes, courts apply a "modified categorical approach" under which they

-23-

consider a limited class of documents, like indictments, jury instructions, plea agreements and plea colloquies, to determine which alternative formed the basis for a defendant's conviction. *Nijhawan*, 557 U.S. at 41; *Shepard*, 544 U.S. at 20. The court then compares the elements of the listed federal crime with the elements of the defendant's prior offense, using the elements that actually formed the basis of the conviction. *Descamps*, 133 S. Ct. at 2281.

In contrast, where Congress has indicated its use of the terms "offense," "crime," or "felony" was intended to refer to the specific acts in which a defendant has engaged on a prior occasion, we use a circumstance-specific approach. *Nijhawan*, 557 U.S. at 34–35. Unlike the categorical and modified categorical approaches, courts using a circumstance-specific approach may look beyond the elements of the prior offense and consider "the facts and circumstances underlying an offender's conviction." *Id.* at 34. Because a comparison made under the categorical approach may lead to a different conclusion than one made under the circumstance-specific approach, it is important to determine which approach Congress intended for a particular statute.

So, the first question relevant to our review of the district court's classification of Mr. White as a tier III sex offender is whether Congress intended "offense" as used in § 16911 to refer to a generic crime or to the particular conduct of this defendant.[13] *See*

---

[13] The Tenth Circuit has not yet determined the proper methodology for assessing a sex offender's tier classification. *See United States v. Forster*, 549 F. App'x 757, 766–

Continued . . .

*United States v. Lamirand*, 669 F.3d 1091, 1095–96 (10th Cir. 2012) (holding that when interpreting a statute, we attempt to give effect to Congressional intent). To discern Congress's intent, we apply our usual tools of statutory construction, beginning with an examination of the statutory language. *See Nijhawan v. Holder*, 557 U.S. 29, 38–39 (2009) (examining language of the INA and adopting a circumstance-specific approach); *Taylor v. United States*, 495 U.S. 575, 600 (1990) (examining language of the Career Criminals Amendment Act and adopting a modified categorical approach to a divisible state statute). If the plain language of the relevant statute does not provide a definitive answer, we must review the legislative history for signs of Congress's intent. *See Taylor*, 495 U.S. at 602. But in applying these tools to these types of statutes, the Supreme Court has instructed that we also consider the practical difficulties and potential unfairness of applying a circumstance-specific approach, including the burden on the trial courts of sifting through records from prior cases, the impact of unresolved evidentiary issues, and the potential inequity of imposing consequences based on unproven factual allegations where the defendant has pleaded guilty to a lesser offense. *Id.* at 601–02.[14]

_____

Cont.

69 (10th Cir. 2013) (affirming a sentence under either a categorical or circumstance-specific approach).

[14] In *Descamps v. United States*, the Supreme Court identified a fourth concern arising under the ACCA, which actually increases the maximum statutory penalty available. 133 S. Ct. 2276, 2288 (2013); 18 U.S.C. § 924(e). The Supreme Court applied a categorical approach to the comparison required under the ACCA because

Continued . . .

Turning first to SORNA's statutory language, Section 16911(4) defines a tier III sex offender as:

> The term "tier III sex offender" means a sex offender whose offense is punishable by imprisonment for more than 1 year and—
> (A)　is comparable to or more severe than the following offenses, or an attempt or conspiracy to commit such an offense:
> 　(i)　aggravated sexual abuse or sexual abuse (as described in sections 2241 and 2242 of Title 18); or
> 　(ii)　abusive sexual contact (as described in section 2244 of Title 18) against a minor who has not attained the age of 13 years;
> (B)　involves kidnapping of a minor (unless committed by a parent or guardian); or
> (C)　occurs after the offender becomes a tier II sex offender.

Of significance here is Congress's reference to the offenses listed in subsection (4)(A) as an "offense described in" sections 2241, 2242, and 2244 of Title 18. The Supreme Court has indicated that a reference to a corresponding section of the criminal code strongly suggests a generic intent. *See Nijhawan*, 557 U.S. at 37 (holding that a statute that "lists several of its 'offenses' in language that must refer to generic crimes," including "sections [that] refer specifically to an 'offense described in' a particular section of the Federal Criminal Code" invokes a categorical approach); *cf. United States*

_____

Cont.

consideration of the facts underpinning a defendant's prior conviction would raise "serious Sixth Amendment concerns." *Descamps*, 133 S. Ct. at 2288; *see Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Because the tier classifications at issue here do not increase the maximum statutory sentences available, we do not address this fourth consideration.

*v. Dodge,* 597 F.3d 1347, 1350–51 (11th Cir. 2010) (holding that under § 16911(5)(A)(ii) and (7)(H), "a criminal offense that is specified against a minor," and does not cross-reference any section of the Federal Criminal Code, authorizes a circumstance-specific approach). Thus, subsection (4)(A)'s "as described in" language suggests Congress intended courts to employ a categorical approach when comparing a defendant's prior sex offense to crimes listed there.[15]

Also of relevance to Mr. White's classification, is subsection (4)(A)(ii), which targets abusive sexual contact, as defined by 18 U.S.C. § 2244, only if committed "against a minor who has not attained the age of 13 years." Although the express reference to a specific code section strongly suggests a generic approach, § 2244 does not include an element that specifies the age of the victim. To give subsection (4)(A)(ii) meaning then, the court must consider the specific circumstances to determine the victim's age. Otherwise, a comparison based on the categorical approach will never

---

[15] Congress's intent may be different with respect to subsection (4)(B) because it does not reference a specific code section, uses the vague term "involves," and requires that the kidnapping be of a minor and not be committed by the minor's parent or guardian. *See United States v. Dodge*, 597 F.3d 1347, 1354–55 (11th Cir. 2010) (holding that a circumstance specific approach is appropriate to determine what constitutes a "specified offense against a minor" under SORNA because that subsection used general terms like "includes," "involves," "involving," and "by its nature," which suggest a very broad reading). Because there is no suggestion that Mr. White's prior sex offense falls within § 16911(4)(B), we do not decide which method of comparison Congress intended under it.

reveal the age of the victim and therefore never constitute this tier III offense.[16] Thus, the

language of this subsection suggests Congress intended courts to look to the actual age of

the defendant's victim, but to otherwise employ a generic approach to the section of the

criminal code listed.

Examination of the language used to define a tier II sex offender also suggests that

Congress intended courts to use a categorical approach to determine the sex offender tier,

with the exception that the court should consider the specific circumstances to determine

the victim's age. Section 16911(3) defines tier II sex offenders:

> The term "tier II sex offender" means a sex offender other than a tier III sex offender whose offense is punishable by imprisonment for more than 1 year and—
> (A)   is comparable to or more severe than the following offenses, when committed against a minor, or an attempt or conspiracy to commit such an offense against a minor:
>     (i)   sex trafficking (as described in section 1591 of Title 18);
>     (ii)   coercion and enticement (as described in section 2422(b) of Title 18);
>     (iii)   transportation with intent to engage in criminal sexual activity (as described in section 2423(a)) of Title 18;
>     (iv)   abusive sexual contact (as described in section 2244 of Title 18);
> (B)   involves—
>     (i)   use of a minor in a sexual performance;
>     (ii)   solicitation of a minor to practice prostitution; or
>     (iii)   production or distribution of child pornography; or
> (C)   occurs after the offender becomes a tier I sex offender.

---

[16] 18 U.S.C. § 2244(c) does increase the maximum sentence for abusive sexual contact against an individual who has not attained the age of twelve years. Even if we were to overlook the inconsistency between twelve and thirteen years used in SORNA, § 2244 does not include a victim's age as an element of the crime of abusive sexual contact. The victim's age is relevant only as a sentencing enhancement.

As with tier III sex offenders, SORNA sometimes refers to specific sections of the Federal Criminal Code when defining a tier II sex offender.[17] *See Nijhawan*, 557 U.S. at 37. Subsection (3)(A) cross-references sex trafficking, coercion and enticement, transportation with intent to engage in criminal sexual activity, and abusive sexual contact "as described in" sections of the Federal Criminal Code. But subsection (3)(A) expressly instructs courts to consider the age of a victim of the generic offenses because it singles out conduct defined in the listed federal crimes "when committed against a minor." Thus, subsection (3)(A) evidences an intent to apply a categorical approach for purposes of comparing the defendant's prior sex offense with the listed section of the criminal code, combined with a circumstance-specific approach with respect to the victim's age. *See Nijhawan*, 557 U.S. at 37–38 (acknowledging that determining whether an alien falsely forged passports, except in the case of a first offense committed for the purpose of assisting a spouse, child, or parent to violate the INA, may require a hybrid approach because Congress referred to the generic crime of forging passports, but contemplated specific consideration of the underlying facts to determine whether the exception applies).

The legislative history of § 16911 is also instructive on this issue. The Act establishing the Sex Offender Registration and Notification Act is titled the "Adam

---

[17] Subsection (3)(B) does not cross-reference the criminal code, but Mr. White's prior sex offense does not arguably fall within it. Therefore, we do discuss Congress's intent with respect to this subsection.

Walsh *Child* Protection and Safety Act." Pub. L. No. 109-248, 120 Stat. 587 (2006) (emphasis added). *See also United States v. Mi Kyung Byun*, 539 F.3d 982, 992 (9th Cir. 2008) (discussing SORNA's legislative history and holding that for purposes of determining whether a defendant is a "sex offender," the court may consider the actual age of the victim). The "Background and Need for the Legislation" section from a House Report on the Act explained, "The sexual victimization of children is overwhelming in magnitude" and the median age of victims of imprisoned sex offenders in one study "was less than 13 years old." H.R. Rep. No. 109-218(I), at 22–23 (2005). Statements of the Representatives and Senators who discussed the bill agree that one of its major purposes was the protection of children. 152 Cong. Rec. H657-2 (daily ed. Mar. 8, 2006) (statement of Rep. Sensenbrenner) (stating that the purpose of the act is to "better protect our children from convicted sex offenders"); *id.* (statement of Rep. Poe) (bill will "mak[e] sure that our children are safer" and target "child predators"); *id.* at S8012-2 (statement of Sen. Hatch) (in explaining his support for the bill, stating "I am determined that Congress will play its part in protecting the children of . . . America").

From this history, it is apparent Congress intended to punish defendants who committed sex offenses against children more severely than other sex offenders. This supports our conclusion that even when the tier classifications refer to generic crimes that invoke a categorical approach, Congress intended the courts to also consider the actual age of the victim by looking to the specific circumstances of the defendant's crime. *See Mi Kyung Byun*, 539 F.3d at 992–93 (holding that SORNA's legislative history, "shows

-30-

that Congress intended to include all individuals who commit sex crimes against minors, not only those who were convicted under a statute having the age of the victim as an element").

Turning to the equitable and practical concerns highlighted by the Supreme Court, we conclude that when SORNA cross-references a specific section of the criminal code, the use of a circumstance-specific methodology should be limited to the determination of the victim's age. By using a categorical approach for the comparison between the defendant's offense and the listed federal statute, the court will avoid many of the problems with a circumstance-specific approach identified by the Supreme Court. *See Taylor*, 495 U.S. at 600–02. A categorical approach gives the defendant most of the benefits of a plea bargain, strictly confines the need to consult documents from a prior proceeding, and avoids the inequity of relying on allegations of the indictment where the defendant may have had no reason to challenge those assertions. *See id.*; *Descamps*, 133 S. Ct. at 2289 (stating that a defendant may have little incentive to challenge factual allegations not relevant to the elements of the crime with which he is charged). In contrast, a victim's age is a single fact that is easy to prove and, in an ordinary case, not easily disputed.

In light of the text of the statute, its legislative history, and these practical and equitable concerns, we conclude Congress intended courts to apply a categorical approach to sex offender tier classifications designated by reference to a specific federal criminal statute, but to employ a circumstance-specific comparison for the limited

-31-

purpose of determining the victim's age.[18] *See Mi Kyung Byun*, 539 F.3d at 994 (holding

that the special concern Congress displayed for minor victims in both the text of § 16911

and its legislative history evidenced an intent to allow the sentencing court to go beyond

a categorical approach for the limited purpose of determining the age of the defendant's

victim(s)). Having so determined, we next apply this approach to Mr. White's prior

offense.

### c. *Mr. White's sex offender classification*

In reaching its conclusion that Mr. White is a tier III sex offender, the district court

looked to the North Carolina indictment, which alleged his victim was under the age of

[18] Our conclusion is consistent with the interpretation of SORNA in regulations promulgated by the Attorney General. Office of the Attorney General; The National Guidelines for Sex Offender Registration and Notification, 73 Fed. Reg. 38,030, 38,031, (July 2, 2008) ("[J]urisdictions are not required by SORNA to look beyond the elements of the offense of conviction in determining registration requirements, except with respect to victim age."); *id.* at 38,053–54. Because we reached our conclusion without reliance on these regulations, we need not address the thorny issue of whether it is appropriate to defer to a prosecuting agency's interpretation of a criminal statute. *Compare United States v. O'Hagan*, 521 U.S. 642, 673–77 (1997) (deferring to an SEC interpretation of a criminal statute), *Babbitt v. Sweet Home Chapter of Cmties. for a Great Ore.*, 515 U.S. 687, 703 (1995) (applying "some degree of deference" to regulations interpreting parts of the Endangered Species Act that provide for criminal penalties), *United States v. Hubenka*, 438 F.3d 1026, 1034 (10th Cir. 2006) (deferring to the Army Corps of Engineers' interpretation of part of the Clean Water Act), *N.L.R.B. v. Okla. Fixture Co.*, 332 F.3d 1284, 1287 (10th Cir. 2003) (en banc) (giving "some deference" to the NLRB's interpretation of a labor law that carries criminal penalties), *and United States v. Piper*, No. 1:12-CR-41-JGM-1, 2013 WL 4052897, at *5–7 (D. Vt. Aug. 12, 2013) (unpublished) (deferring to the SMART Guidelines), *with Abramski v. United States*, 134 S. Ct. 2259, 2274 (2014) ("[C]riminal laws are for courts, not for the Government, to construe"), *Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., dissenting) (arguing deference is inappropriate in criminal cases), *and Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring) (same).

sixteen at the time of the offense, that Mr. White was then over sixteen years of age and thus at least five years older than the victim, and that Mr. White willfully took and attempted to take immoral, improper, and indecent liberties with the victim for the purpose of arousing and gratifying his sexual desire. The district court also consulted police reports from North Carolina, indicating the victim was the seven-year-old daughter of Mr. White's girlfriend, and that the offense involved physical contact. Although the district court's consideration of the facts relevant to the victim's age was appropriate, it erred by employing a circumstance-specific approach for purposes of comparing Mr. White's North Carolina offense with the federal crimes cross-referenced in § 16911(4)(A). As discussed, this comparison should have been made using a categorical approach.

### i. Mr. White's state crime

To apply a categorical approach, we "compare the elements of the statute forming the basis of the defendant's conviction with the elements of the [predicate] crime." *Descamps*, 133 S. Ct. at 2281. Mr. White was convicted of taking indecent liberties with a child in violation of section 14-202.1 of the North Carolina Code. North Carolina defines taking indecent liberties with a child as either (1) willfully taking or attempting "to take any immoral, improper, or indecent liberties with any child of either sex under the age of 16 years for the purpose of arousing or gratifying sexual desire," or (2) willfully committing or attempting "to commit any lewd or lascivious act upon or with the body or any part or member of the body of any child of either sex under the age of 16

-33-

years." N.C. Gen. Stat. § 14-202.1(a). Because this statute provides alternative ways in which it can be violated, it is divisible. Thus, we review the indictment under the modified categorical approach to ascertain which portion of the statute formed the basis of Mr. White's conviction. The State of North Carolina indicted Mr. White under the first alternative: for willfully taking and attempting to take immoral, improper, and indecent liberties with a victim under the age of sixteen for the purpose of arousing and gratifying sexual desire. We now compare the elements of the statute as applied to Mr. White with the elements of the federal crimes listed in § 16911(4)(A) and (3)(A) to determine Mr. White's proper tier classification.

North Carolina has condensed "immoral, improper, and indecent liberties" to simply "indecent liberties," which are defined as "such liberties as the common sense of society would regard as indecent and improper." *State v. Every*, 578 S.E.2d 642, 647 (N.C. Ct. App. 2003) (internal quotation marks omitted). But "neither a completed sexual act nor an offensive touching of the victim are required to violate the statute." *Id.* Indeed, no physical touching is required to violate the statute. *State v. Nesbitt*, 515 S.E.2d 503, 506 (N.C. Ct. App. 1999); *see also State v. McClary*, 679 S.E.2d 414, 418 (N.C. Ct. App. 2009) (holding that giving a child a graphic letter for the purpose of soliciting sex violates the statute); *State v. McClees*, 424 S.E.2d 687, 689–90 (N.C. Ct. App. 1993) (holding that secretly videotaping an undressing child violates the statute). The elements of Mr. White's state offense therefore include that he: (1) willfully, (2) took or attempted to take indecent liberties, (3) with a minor, (4) for the purpose of arousing and gratifying

-34-

sexual desire. Of importance here, physical contact is not an element of the North Carolina crime of which Mr. White was convicted.

### ii. Comparable federal crimes

When we compare the elements of Mr. White's state crime to the elements of the listed federal crimes, it is apparent that he is not a tier II or tier III sex offender. As discussed, the only portions of the definition of a tier III sex offender relevant here are § 16911(4)(A)(i) and (ii). These subsections impose tier III classification for sex offenses comparable to aggravated sexual abuse, sexual abuse, or abusive sexual contact against a minor under thirteen, as defined by 18 U.S.C. §§ 2241, 2242, and 2244. With respect to tier II, the only relevant subsection is § 16911(3)(A)(iv), which includes "abusive sexual contact (as described in Section 2244 of Title 18)," when it is committed against a minor.

Both aggravated sexual abuse and sexual abuse require the defendant to have engaged in a sexual act. 18 U.S.C. § 2241; *id.* § 2242. In turn, "sexual act" is defined to include (a) genital-genital contact, (b) oral-genital contact, (c) penetration of the genitals with certain sexual or abusive intents, or (d) the direct touching of genitals with certain sexual or abusive intents. *Id.* § 2246(2). Thus, because any violation of §§ 2241 or 2242 requires engaging in a sexual act, it necessarily requires physical contact.

Similarly, abusive sexual contact, which could qualify Mr. White as a tier II or tier III sex offender, is defined by § 2244 to prohibit conduct that would violate §§ 2241, 2242, or 2243, where there was sexual contact, rather than a sexual act. "Sexual contact" is defined more broadly than "sexual act," but still requires physical contact. *Id.*

-35-

§ 2246(3) ("'Sexual contact' means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."). Accordingly, any violation of § 2244, like violations of §§ 2241 and 2242, requires physical contact.

### iii. Mr. White is a tier I sex offender

Because §§ 2241, 2242, and 2244 each require physical contact, Mr. White is a tier III or tier II sex offender under the categorical approach only if his state crime also includes physical contact as an element. Recall, however, that North Carolina does not require physical contact as an element of section 14-202.1(a). Accordingly, Mr. White is not a tier III or tier II sex offender; by default, he is a tier I sex offender. *See* 42 U.S.C. § 16911(2) ("The term 'tier I sex offender' means a sex offender other than a tier II or tier III sex offender.").

The district court erred in treating Mr. White as a tier III sex offender for purposes of calculating his Guidelines sentencing range. The sentence is therefore procedurally unreasonable and we must vacate it and remand to the district court for resentencing.

## 2. Conditions of Supervised Release

Mr. White next claims, as he did in the district court, that two of the special conditions of supervised release are unconstitutional. Specifically, Mr. White challenges the third and fourth special conditions of his release, which, respectively, prohibit him from being at any residence where children under the age of eighteen reside without the

prior written permission of the U.S. Probation Office and from associating with children under the age of eighteen except in the presence of a responsible adult who is aware of his background and current offense and who has been approved by the U.S. Probation Officer. Mr. White makes two related arguments on appeal. First, he asserts the conditions infringe upon his substantive due process right of familial association by denying him unfettered contact with his minor grandchildren and nieces. Second, he contends the conditions improperly delegate sentencing authority to the probation officer.

Because we must vacate Mr. White's sentence, we also vacate the conditions of supervised release. But Mr. White is free to raise these challenges on remand, *see* Fed. R. Crim. P. 32.1(c); 18 U.S.C. § 3583(e), so we briefly consider them here to provide guidance to the district court.

### a. The right to familial association

General restrictions on contact with children do not involve a greater deprivation of liberty than reasonably necessary in an ordinary case where a defendant has committed a sex offense against children or other vulnerable victims. *United States v. Smith*, 606 F.3d 1270, 1282–83 (10th Cir. 2010). "But restrictions on a defendant's contact with his own children are subject to stricter scrutiny," *United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. 2013), because "the relationship between parent and child is constitutionally protected," and "a father has a fundamental liberty interest in maintaining his familial relationship with his [children]," *United States v. Edgin*, 92 F.3d 1044, 1049 (10th Cir. 1996) (internal quotation marks omitted). In light of the importance of this liberty

-37-

interest, "special conditions that interfere with the [parental] right of familial association can do so only in compelling circumstances," and must "be especially fine-tuned to achieve the statutory purposes of sentencing." *Bear*, 769 F.3d at 1229 (internal quotation marks omitted).

Mr. White does not claim to have any minor children. Thus, the issue presented turns on the degree to which conditions of supervised release may intrude on his familial association with his minor grandchildren and nieces.[19] To put our analysis in context, we first address the scope of the parental right to familial association. We then explore the extent to which similar rights have been afforded to other family members. Finally, we apply that jurisprudence to the facts of this case and conclude the record must be developed on remand to resolve this issue.

The liberty interest parents have in the care, custody, and control of their children is a substantive due process right protected by the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Indeed, it "is perhaps the oldest of the fundamental

---

[19] The government contends that the constitutional right of familial association is limited to parent/child relationships. In the district court, Mr. White made no attempt to address that argument or to define the rights enjoyed by grandparents or uncles. In this court, he addressed these issues only by supplemental authority filed prior to oral argument. Ordinarily, arguments inadequately briefed in an appellant's opening brief are waived. *United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011). But we have vacated Mr. White's sentence and remanded this case for resentencing on other grounds. Under these circumstances, both Federal Rule of Criminal Procedure 32.1(c) and 18 U.S.C. § 3583(e) provide a vehicle for Mr. White to request modification of the conditions of supervised release even if he has waived his challenge for purposes of this appeal. We therefore depart from our usual practices with respect to preservation only to assist the district court on remand.

liberty interests recognized by [the Supreme] Court." *Id*. The Court first held the Due

Process Clause protects a parent's substantive right to "establish a home and bring up

children" and "to control the education of their own" in *Meyer v. Nebraska*. 262 U.S.

390, 399, 401 (1923). Shortly thereafter, it held restrictions on the "liberty of parents and

guardians to direct the upbringing and education of children under their control" are

unconstitutional. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925). The Court

reaffirmed this right in *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), and more

recently announced "it cannot now be doubted that the Due Process Clause of the

Fourteenth Amendment protects the fundamental right of parents to make decisions

concerning the care, custody, and control of their children." *Troxel,* 530 U.S. at 66.[20]

---

[20] *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one's children." (citations omitted)); *Santosky v. Kramer,* 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Parham v. J. R.,* 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected" because the right to "custody, care and nurture of the child reside[s] first in the parents."); *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Stanley v. Illinois,* 405 U.S. 645, 651 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal

Continued . . .

Although the Supreme Court has also recognized familial rights in persons other than parents, the parameters of that interest are less well-defined. *Compare Moore v. City of East Cleveland*, 431 U.S. 494, 496, 505–06 (1977) (rejecting argument that right of familial association is limited to parents and striking as unconstitutional a city zoning ordinance subjecting grandmother to prosecution for living with her son and two grandsons, one of whom was the child of her deceased daughter), *with Troxel*, 530 U.S. at 60–61 (2000) (holding unconstitutional a state statute allowing the court to order minor children to exercise visitation with grandparents, over a fit parent's objection). In *Trujillo v. Board of County Commissioners*, this circuit held that a mother and a sister of an adult decedent could bring a § 1983 wrongful death claim based on the loss of their constitutional right to familial association. 768 F.2d 1186, 1188–89 (10th Cir. 1985). Citing *Moore*, we explained that the liberty interest in familial relationships includes interests "other than strictly parental ones," which could include grandparent-grandchild relationships. *Id.* at 1188; *see also Suasnavas v. Stover*, 196 F. App'x 647, 657 (10th Cir. 2006) (unpublished) (relying on *Trujillo* in upholding the denial of qualified immunity in a § 1983 action based on child welfare workers' violation of the grandparents' clearly established constitutional right of familial association). But when grandparents are not playing any sort of custodial role, we have not afforded their right to familial association

_____
Cont.

is made to liberties which derive merely from shifting economic arrangements.'" (citation omitted)).

the same degree of protection as a parental right. *Trujillo*, 768 F.2d at 1189 ("[T]he parental relationship . . . warrant[s] the greatest degree of protection and require[s] the state to demonstrate a more compelling interest to justify an intrusion on that relationship" than intrusions on other familial relationships.); *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1175 (10th Cir. 2013) (explaining in dicta that "[w]hen extending the right [of familial association] to grandparents, however, courts often consider whether the grandparents are 'custodial figure[s]' or 'acting in loco parentis,' and 'whether there is a potential conflict between the rights of the [grandparent] and the rights or interests of the [child's] natural parents.'" (citations omitted) (second, third, and fourth alterations in original)).[21]

---

[21] This approach is consistent with that adopted by other jurisdictions. *See, e.g., Johnson v. City of Cincinnati*, 310 F.3d 484, 499–501 (6th Cir. 2002) (holding that a grandparent has a due process right of familial association with her grandchildren if she participates in child-rearing, for instance as an active participant in the lives and activities of her grandchildren with the consent and support of the children's mother, even if the grandmother might not have had a due process right if she had only visited the grandchildren); *Miller v. California*, 355 F.3d 1172, 1175–76 (9th Cir. 2004) (ruling that grandparents have no substantive due process right to family integrity and association relative to grandchildren because they had not formed a family unit, the grandchildren were effectively wards of the state, and the grandparents' interests conflicted with that of the children's mother); *Mullins v. Oregon*, 57 F.3d 789, 796 (9th Cir. 1995) (rejecting an argument that a biological grandmother had a constitutional interest in the adoption or society of her grandchildren where she had only maintained occasional contact with her grandchildren and lacked any emotional, financial or custodial history with them); *Ellis v. Hamilton*, 669 F.2d 510, 512–14 (7th Cir. 1982) (ruling that a plaintiff who was a child's great-aunt, adoptive grandmother, de facto mother and father, and custodian had a due process right to associate with the child).

These authorities lead to the conclusion that while a special condition of supervised release may only infringe on the parental right to familial association if there are compelling circumstances, a non-custodial grandparent's right to familial association is entitled to less constitutional protection. If Mr. White chooses to pursue this argument on remand, it will be his burden to demonstrate the nature of his relationship to his grandchildren and nieces. The district court is free to consider the degree to which that relationship resembles a parental one and impose conditions of supervised release accordingly. We do note, however, that the district court has already identified several facts relevant to this determination.

Specifically, the district court noted that Mr. White's seven-year-old victim was "close to a relative" and someone he considered "like a daughter." Although the court acknowledged the rehabilitative benefits of access to family, it explained that the conditions did not forbid Mr. White from association with his family. Instead, they merely required Mr. White to obtain prior permission and to be appropriately supervised when in the presence of children. The district court further clarified that the supervising adult could be a relative.

We agree that the specific circumstances identified by the district court here are relevant, and that they are likely sufficient to justify restrictions on a non-custodial grandparent's right to familial association. But if Mr. White's familial relationships are custodial, more information may be necessary. In reversing special conditions of supervised release that infringed on the defendant's parental right of familial association

in *Bear*, we noted the government had presented no evidence that "in the twelve years since Mr. Bear's sex offense conviction he has committed any sexual offense, displayed a propensity to commit future sexual offenses, or exhibited a proclivity toward sexual violence." 769 F.3d at 1229. And we further stated there was no evidence in the record that Mr. Bear had "continuing deviant sexual tendencies, fantasizes about having sex with children, or has otherwise displayed a danger to his own . . . children." *Id.* In light of our decision in *Bear*, the district court may need to consider the length of time since Mr. White's original conviction and any relevant information predictive of his future conduct when deciding on conditions of supervised release.

On remand, the district court should consider the nature of Mr. White's relationship with his grandchildren and nieces and afford him a level of constitutional protection directly proportional to the significance of that liberty interest. The district court should also enter specific findings justifying any conditions of supervised release that infringe on a protected right of familial association. If a parent-like right is impacted, the conditions must be supported by express findings of compelling circumstances.

### b. Delegation to the Probation Officer

Finally, Mr. White claims the conditions of supervised release improperly delegated judicial authority to the probation officer. "Article III of the United States Constitution confers the authority to impose punishment on the judiciary, and the judiciary may not delegate that authority to a nonjudicial officer." *Bear*, 769 F.3d at 1230. To decide whether a condition of supervised release improperly delegates

-43-

sentencing authority to a probation officer, we "distinguish between [permissible] delegations that merely task the probation officer with performing ministerial acts or support services related to the punishment imposed and [impermissible] delegations that allow the officer to decide the nature or extent of the defendant's punishment." *United States v. Mike*, 632 F.3d 686, 695 (10th Cir. 2011). Like the review of the conditions of supervised release, "[t]his inquiry focuses on the liberty interest affected by the probation officer's discretion." *Bear*, 769 F.3d at 1230. "Conditions that touch on significant liberty interests are qualitatively different from those that do not," and so allowing a probation officer to decide whether to restrict a significant liberty interest improperly delegates the judicial authority to determine the nature and extent of a defendant's punishment. *Id.*

As discussed above, the factual record before us is not sufficiently developed to determine the precise nature of Mr. White's relationship with his grandchildren and nieces. Accordingly, we are unable to determine the contours of the liberty interest at stake. But for the purposes of our analysis of this issue, we will assume Mr. White's relationship is sufficiently custodial to qualify for the highest level of constitutional protection. We will further assume the district court made the requisite factual findings indicating that compelling circumstances nevertheless justify restricting Mr. White's access to his minor relatives. For the reasons discussed below, even operating under these assumptions, which create the greatest limits on delegation, the degree of delegation to Mr. White's probation officers here was not improper.

-44-

Mr. White relies on *United States v. Voelker*, where the Third Circuit struck down a special condition of supervised release that imposed a lifetime ban on association with minors unless defendant obtained prior approval of a probation officer. 489 F.3d 139, 153–55 (3d Cir. 2007). The sentencing court provided "no guidance whatsoever for the exercise of that discretion," so the probation officer became "the sole authority for deciding if [the defendant] will ever have unsupervised contact with any minor, including his own children, for the rest of his life." *Id.* at 154. The Third Circuit held the condition was an impermissible abdication of the judiciary's sentencing responsibility, and vacated the condition with instructions for the district court to clarify it on remand. *Id.* at 155.

Mr. White's conditions of supervised release are significantly different than the conditions challenged in *Voelker*. The restrictions here are less onerous than those in *Voelker* because Mr. White was sentenced to only five years of supervised release, rather than the lifetime conditions imposed in *Voelker*. And the degree of delegation in this case is narrower than the delegation in *Voelker*. The sentencing judge here provided guidance to the probation office about the exercise of its discretion when it informed the parties that approval should be granted unless Mr. White poses a safety risk to children, and that the court expected the probation office would approve other family members as supervising adults. The district court also indicated it would remain involved in approving Mr. White's contact with minors if future problems arose, and that it has established guidelines and regularly consults with the probation office about approvals. Under these circumstances, the district court did not improperly delegate the authority to

-45-

preapprove Mr. White's contact with his grandchildren and nieces, even if a significant liberty interest is implicated. Instead, the district court merely permitted the probation officer to provide "support services related to the punishment imposed." *Mike*, 632 F.3d at 695.

## IV. CONCLUSION

For these reasons, we **AFFIRM** Mr. White's conviction for failure to register in violation of 18 U.S.C. § 2250(a), but we **VACATE** his sentence and the special conditions of his supervised release and remand for further proceedings.