**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 14, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JOSE AMADOR,

     Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

DIANA MEKAEIL,

     Defendant - Appellant.

No. 17-3018
(D.C. No. 6:16-CR-10016-EFM-1)
(D. Kan.)

No. 17-3135
(D.C. No. 6:16-CR-10016-EFM-2)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **BALDOCK**, and **EID**, Circuit Judges.
_____

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Defendants Jose Amador and Diana Mekaeil were indicted by a federal grand jury on drug trafficking and firearms charges after incriminating evidence was seized from their hotel room, rental truck, and a backpack carried by Amador. Amador and Mekaeil moved to suppress the evidence seized from the hotel room, but their motion was denied by the district court. As part of its ruling, the district court also held that Amador's warrantless arrest, which preceded the search of the hotel room, was reasonable. Amador and Mekaeil then each entered into written plea agreements, reserving their right to appeal the district court's denial of their motion to suppress. Both defendants now appeal. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I

*Factual background*

On November 16, 2015, Brianna Hines-Black was working as a housekeeper at the Hampton Inn and Suites in Mulvane, Kansas. The hotel was attached to the Kansas Star Casino, a gambling facility owned by the State of Kansas. At approximately 1:57 p.m. that afternoon, Hines-Black knocked on the door of Room 150.[1] Receiving no response to her knocks, Hines-Black entered Room 150 with the intent of cleaning it. Upon entering the room, Hines-Black observed several items in open view that caught her attention. These included a container of a flammable substance that she believed might be lighter fluid, two glass pipes that she later

---

[1] According to Hines-Black, there was not a "Do Not Disturb" sign on the door of Room 150. She testified that had such a sign been present on the door, hotel policy would not have allowed her to knock on the door or enter the room.

2

described to law enforcement agents as crack pipes, a scale, a beaker, and what appeared to be a plastic bag full of crack in an open drawer.

After observing these items, Hines-Black proceeded to clean the room to the best of her ability and then left the room at 2:08 p.m., approximately eleven minutes after she entered it. Hines-Black then went immediately to her supervisor, a woman named Kendra, and told her about the items she had seen in Room 150. Kendra informed Hines-Black that she would take care of the situation.

Kendra contacted Joseph Shanks, the manager of the hotel, and informed him about what Hines-Black had seen in Room 150. Shanks, in turn, contacted enforcement agents who were assigned to the casino by the Kansas Racing and Gaming Commission. One of those agents, Craig Pentecost, was specifically assigned to investigate. Pentecost called the Mulvane Police Department and asked them to send an officer to the hotel to assist in the investigation.

Pentecost then proceeded to the hotel and spoke with both Shanks and Hines-Black. Shanks provided Pentecost with a copy of the bill for Room 150, which indicated the room had been rented by a woman named Diana Mekaeil from November 15, 2016, to November 16, 2016. Hines-Black told Pentecost that when she entered Room 150, she noticed several butane lighters, what appeared to be glass crack pipes sitting out on a desk, and a bag of crack in an open desk drawer.

Officer Brandon Bohannon of the Mulvane Police Department arrived at the hotel and Pentecost briefed him on the situation. Bohannon and Pentecost mutually decided that the Mulvane Police Department would take the lead on the matter.

3

Bohannon then spoke with Hines-Black. After doing so, Bohannon and Pentecost decided to enter Room 150. According to Pentecost, he was concerned that the room was being used as a methamphetamine lab. Bohannon was concerned about the presence of a flammable substance in the room and whether it presented a health hazard to the facility.

At approximately 2:38 p.m., Pentecost and Bohannon approached Room 150, knocked on the door, and announced "Police department." ROA, Vol. 3 at 41.[2] No one responded to their knocks. Consequently, with the assistance of Shanks, Pentecost and Bohannon entered Room 150. Inside the room, Pentecost and Bohannon observed, in open view on a table, two butane lighters, a can of acetone, a large box of plastic sandwich bags, two glass pipes, a plastic measuring cup, a metal measuring spoon, a roll of cellophane wrap, and a set of digital scales. The men also noticed that the smoke detector in the room had been covered with a red plastic-type bag. Based upon their observations, Pentecost and Bohannon decided to leave the room, seal it, and obtain a search warrant.

Bohannon contacted his supervisor, Lieutenant Matthew O'Brien, and asked him to report to the scene. When O'Brien arrived at the hotel, Bohannon took him inside Room 150 and showed him the items that were in plain view. They then left Room 150 and O'Brien concluded that they needed a warrant to search the room.

---

[2] All citations to the record on appeal in this opinion are intended to refer to the record in Appeal No. 17-3018.

In the meantime, another Kansas Racing and Gaming Commission agent reviewed surveillance footage from the hotel to determine who had been in Room 150. The footage revealed that a man and a woman had been occupying the room. At approximately 3:58 p.m., those two individuals entered the hotel lobby and headed to Room 150. As they did so, they were taken into custody by Mulvane police officers. The male suspect was determined to be Amador and the female suspect was determined to be Mekaeil. At the time of his arrest, Amador was carrying a backpack that contained a stolen .45 caliber loaded handgun, approximately ¼ pound of cocaine, 1 ½ pounds of methamphetamine, an unspecified quantity of black tar heroin, and prescription pills. Both Amador and Mekaeil were determined to be in possession of room keys for Room 150.

O'Brien ultimately prepared an application for a search warrant that stated, in pertinent part, as follows:

> That the basis for this probable cause is: Your Affiant, Matthew T. O'Brien, #102, is currently a Detective Lieutenant with the Mulvane Police Department and is currently assigned to the Investigation Unit. Your Affiant was informed by Mulvane Police Officer Brandon Bohannon that he was called to the Hampton Inn, room 150, located at 785 Kansas Star Drive, City of Mulvane, County of Sumner, Kansas, of drugs being found in room 150. Upon arrival Officer Bohannon stated he met Kansas Racing Gaming Commission Special Agent Craig Pentecost and Hampton Inn housekeeping employee Brianaa [sic] Black. Ms. Black stated that she was servicing room 150, when she observed in plain view on a table a scale, meth pipe, Ziploc sandwich bags, acetone, and other items. Officer Bohannon further informed your Affiant that Miss Black escorted him and Agent Pentecost in the room and they observed in plainview [sic] the above listed items and in an open desk drawer in plain view he observed two clear plastic bags containing what appeared to be crystal methamphetamine. Officer Bohannon also stated he observed numerous lap tops [sic] computers,

Ipads [sic], numerous cell phones, checkbook in another name, jewerly [sic] and other items.

Your Affiant had learned from the Hampton Inn that room 150 was rented by Diana Mekaeil of Wichita, Kansas and that their [sic] were two people in the room.

Kansas Racing Gaming Commission Special Agent Craig Pentecost informed your Affiant that the Kansas Star Casino Surveillance officer has searched surveillance video and observed that on November 16, 2015 at 1103 hours, a female later identified as Diana Mekaeil and a male later identified [sic] Jose Amador enter room 150 and exited the room around 1110 hours. Agent Pentecost stated the surveillance video captured Diana Mekaeil and Jose Amador entered [sic] a red 2015 Dodge Ram Pick up [sic] truck bearing Kansas 826FBZ and drive away.

Officer Bohannon further informed your Affiant that at approximately 1530 hours, Diana Mekaeil and Jose Amador arrived at the Hampton Inn and were arrested as they exited the red Dodge Ram pick up [sic] truck. Pursuant to the arrest Officer Bohannon searched Jose Amador's backpack he was carrying and observed in the backpack approximately ¼ lb of cocaine, 1 ½ lbs of methamphetamine, black tar heroine [sic], pills, "cotton candy" methamphetamine, and a stolen 45. [sic] Calibrie [sic] firearm stolen out of McPherson. Additionally, Officer Bohannon stated that both Mekaeil and Amador had on [sic] their possession a key to room 150.

Your Affiant was informed by Mr. Tate Jackson of Enterprise who advised that the 2015 Dodge Ran pick up [sic] truck was rented by a Paul Schaffer and it was done on line [sic] and no further information was provided.

Your Affiant had learned that Diana Mekaeil [sic] numerous arrests for possession of illegal drugs and no tax stamp and Jose Amador had several arrests for burglary and one for firearms possession.

Based on your Affiant [sic] over forty years of law enforcement experience, believes that there is illegal contraband in the 2015 Dodge Ram Pick up [sic].

ROA, Vol. 1 at 61-62.

A search warrant was ultimately issued and executed for Room 150 and the rental truck that was used by defendants.

*Procedural background*

On January 12, 2016, a federal grand jury returned a four-count indictment against Amador and Mekaeil. Count One charged both defendants with conspiracy to possess with the intent to distribute, and to distribute, methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(A)(ii)(II). Counts Two, Three, and Four charged Amador with being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Mekaeil moved to suppress all evidence seized during the execution of the search warrant for Room 150. Amador subsequently sought and was granted leave to join Mekaeil's motion.[3] On June 13, 2016, the district court held an evidentiary hearing on defendants' motion to suppress.

On June 30, 2016, the district court issued a memorandum and order denying the defendants' motion to suppress. In doing so, the district court concluded "that the officers' initial search was unconstitutional because law enforcement did not have consent to enter the room and exigent circumstances did not exist for a warrantless search." ROA, Vol. 1 at 74. "Nevertheless," the district court concluded that "the later obtained search warrant and subsequent search were based on probable cause absent the officers' illegal observations." Id. Specifically, the district court noted

---

[3] It is undisputed that Room 150 was rented solely in Mekaeil's name. At no point during the district court proceedings, however, did the government challenge Amador's standing to challenge the search of Room 150. "Because [his] standing, or lack thereof, is rooted in substantive Fourth Amendment law rather than Article III, the [g]overnment has waived any objection as to [his] standing." United States v. DeGasso, 369 F.3d 1139, 1143 n.3 (10th Cir. 2004).

that "[s]uch information include[d] a statement that [Hines-Black] observed a scale, meth pipe, ziplock sandwich bags, acetone, and other items in room 150 when she cleaned it." Id. at 80.

In October of 2016, the government, in anticipation of entering into plea agreements with the defendants, filed separate informations against Amador and Mekaeil. The information filed against Amador charged him with one count of possessing a firearm in furtherance of a drug trafficking crime, i.e., possession with the intent to distribute methamphetamine, in violation of 18 U.S.C. § 924(c), and one count of knowingly and intentionally using a communication facility, i.e., a telephone, to facilitate the distribution of methamphetamine, in violation of 21 U.S.C. § 843(b). The information filed against Mekaeil charged her with a single count of knowingly and intentionally using a communication facility, i.e., a telephone, to facilitate the distribution of methamphetamine, in violation of 21 U.S.C. § 843(b). Both defendants subsequently filed pleadings waiving their right to indictment.

On October 28, 2016, Mekaeil entered into a written plea agreement with the government. On November 1, 2016, Amador likewise entered into a written plea agreement with the government. Under the terms of their respective plea agreements, defendants agreed to plead guilty to the counts alleged against them in the informations. Defendants also agreed to waive any right to appeal or collaterally attack their convictions or sentences, but they both specifically reserved the right to appeal the denial of their motion to suppress. For its part, the government agreed to dismiss the indictment, to recommend sentences at the low end of the applicable

8

Guideline range, and to recommend that defendants receive three-level reductions for acceptance of responsibility.

On January 18, 2017, the district court sentenced Amador to a term of imprisonment of 108 months, to be followed by a three-year term of supervised release. On June 9, 2017, the district court sentenced Mekaeil to a term of imprisonment of 48 months, to be followed by a one-year term of supervised release.

Both defendants filed timely notices of appeal.

## II

Amador argues that the officers lacked probable cause to arrest him at the hotel prior to the search of Room 150. Further, both Amador and Mekaeil challenge the district court's denial of their motion to suppress the evidence seized during the execution of the search warrant for Room 150. We conclude, as explained in greater detail below, that both of these issues lack merit.

### A. *Amador's arrest*

Amador challenges the legality of his warrantless arrest. More specifically, Amador argues that the officers lacked probable cause to arrest him in the lobby of the hotel, prior to the search of Room 150. Generally speaking, we review de novo a district court's determination of whether probable cause existed to arrest a defendant. United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004).

*1) Was the issue raised and addressed below?*

We begin by addressing whether Amador actually raised this argument below. It is undisputed that the written pleadings defendants filed in the district court "did

9

not challenge the evidence seized from the search incident to arrest and did not assert that Defendants' arrests were illegal." ROA, Vol. 1 at 81 n. 17. During the hearing on defendants' motion to suppress, Mekaeil's counsel argued that the arrests of Mekaeil and Amador were illegal because they were "based off of what [the officers] had seen with their own eyes when searching [Room] 150 without a warrant," and that, consequently, any evidence found on the defendants at the time of their arrest should have been excluded from the application filed in support of the search warrant for Room 150. ROA, Vol. 3 at 122. Amador's counsel did not expressly join in this argument or make the same argument. Instead, he argued only that the defendants' arrests "w[ere] predicated upon the fruits of the [illegal] search [of Room 150], not by observation of any illegal conduct, [sic] that was committed in the presence of the officers." Id. at 133.

The district court, in its memorandum and opinion denying defendants' motion to suppress, included a footnote that addressed the arguments made at the hearing by Mekaeil's counsel and stated, in pertinent part:

> During the hearing, in response to the Court's questioning, Defendant Mekaeil's attorney stated that the arrest was illegal because it was based on the information obtained from the officers' illegal search of room 150 or from information obtained from Black (whose veracity was not explained). "[A] warrantless arrest must be supported by probable cause." United States v. Dozal, 173 F.3d 787, 792 (10th Cir. 1999). Considering the totality of the circumstances, an officer has probable cause to arrest if he "learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." Id. (quotation marks and citation omitted). Here, there was sufficient information from a reasonably trustworthy source to give the officers' [sic] probable cause to believe that an offense had been or was being committed by Defendants. Thus, to the extent that Defendants'

10

[sic] challenge their arrest as illegal, the Court finds otherwise. Accordingly, the items included as information in the search warrant related to Defendants' arrest is proper.

ROA, Vol. 1 at 81 n. 17.

Thus, in sum, it is not entirely clear that Amador's counsel directly challenged the legality of his arrest in the district court. But it is undisputed that Amador joined in the motion to suppress filed by Mekaeil, the district court held a hearing on the joint motion, and the district court ultimately addressed the legality of both defendants' arrest in its memorandum and opinion. Consequently, we will treat the issue as properly preserved.

*2) Standard of review for warrantless arrests*

As part of his challenge to the district court's ruling, Amador argues that Tenth Circuit precedent setting forth the standard of review for warrantless arrests is erroneous because it directs courts to view the evidence in the light most favorable to the government. See Amador Opening Br. at 19 (citing United Sates v. Zamudio-Carrillo, 499 F.3d 1206, 1209 (10th Cir. 2007)). We conclude it is unnecessary to address this argument for two reasons. First, absent *en banc* reconsideration or an intervening Supreme Court decision, we are bound by Tenth Circuit precedent, such as Zamudio-Carrillo. See United States v. White, 782 F.3d 1118, 1126-27 (10th Cir. 2015). Second, and in any event, the "light most favorable" standard has no impact on the outcome of this appeal because the underlying facts are essentially undisputed.

*3) Probable cause to arrest*

11

Turning to the merits of Amador's challenge, it is well established that "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Dist. of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quotations omitted). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." Id. (quotations and citations omitted). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. (quotations omitted).

Applying these principles to the case at hand, we readily agree with the district court that the officers had probable cause to conduct a warrantless arrest of Amador. Hines-Black's observations of drug paraphernalia and what appeared to be drugs in Room 150, combined with the officers' review of casino and hotel surveillance video showing that Amador occupied Room 150 with Mekaeil, provided the officers with probable cause to believe that Amador was connected to the drug paraphernalia and drugs and had committed one or more drug trafficking offenses.

*B. The evidence seized from Room 150*

12

The district court concluded, and the parties agree on appeal, that it was unlawful for the officers to enter Room 150 without a search warrant. But Amador and Mekaeil take issue with the district court's decision not to apply the exclusionary rule to the evidence that was ultimately seized during the execution of the search warrant for Room 150. More specifically, they approach the admissibility of this evidence from a different angle on appeal. They now argue that the only exception to the exclusionary rule that is potentially applicable here is the independent source doctrine, and they in turn argue that the district court failed to properly apply that doctrine in resolving their motion to suppress. For the reasons more fully discussed below, however, we reject defendants' arguments.

*1) Standard of review*

In addressing a challenge to a district court's denial of a motion to suppress, "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." United States v. Saulsberry, 878 F.3d 946, 949 (10th Cir. 2017) (quotation marks omitted).

*2) The independent source doctrine*

"[T]he exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search," as well "the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search." Murray v. United States, 487 U.S. 533, 536-37 (1988). "Almost simultaneously with [its]

13

development of the exclusionary rule," the Supreme Court "also announced what has come to be known as the 'independent source' doctrine." Id. at 537. The independent source doctrine is one of the exceptions to the exclusionary rule that "involve the causal relationship between the unconstitutional act and the discovery of evidence." Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016). It "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." Id.

"The independent source doctrine" rests "upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." Murray, 487 U.S. at 542. Thus, "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply." Id. Indeed, "[w]hen the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." Nix v. Williams, 467 U.S. 431, 443 (1984).

In Murray, federal law enforcement agents illegally entered an unoccupied warehouse and "observed in plain view numerous burlap-wrapped bales that were later found to contain marijuana." Id. at 535. The agents "left without disturbing the bales, kept the warehouse under surveillance, and did not reenter it until they had a search warrant." Id. "In applying for the warrant, the agents did not mention the prior entry, and did not rely on any observations made during that entry." Id. at 535-

14

36. The warrant was subsequently issued and executed and the agents "seized 270 bales of marijuana and notebooks listing customers for whom the bales were destined." Id. at 536.

The Supreme Court held, in determining whether the seized evidence should be excluded, that the "ultimate question" was "whether the search pursuant to warrant was in fact a genuinely independent source of the" seized evidence. Id. at 542. That would not be the case, the Court held, if "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry" or "information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." Id. Mekaeil and Amador parse Murray into two separate prongs of analysis that ask whether the illegally observed evidence (1) prompted the officers to seek a warrant or (2) affected the magistrate's decision to grant the warrant. Below, we refer to that two-prong framework solely to resolve this appeal.

> *3) The invited error doctrine precludes review of defendants' assertion that the district court failed to consider and apply the first prong of the Murray test*

The record in this case, as we shall proceed to describe, firmly establishes that the district court applied the precise analytical framework that defendants argued in their motion to suppress should be applied. More specifically, the district court, as the defendants urged it to do, considered only whether the application for the search warrant, omitting the information contained therein that was derived from the officers' illegal entries into Room 150, contained sufficient information to provide probable cause for issuance of the search warrant. In doing so, the district court

15

effectively considered only the second prong of the Murray test. In light of these circumstances, we conclude that the invited error doctrine precludes defendants from now arguing that the district court, in resolving their motion to suppress, failed to consider and apply the first prong of the test outlined in Murray.[4]

The invited error doctrine, we have noted, is "a species of waiver" that "precludes a party from arguing against a proposition the party willingly adopted" before the district court. United States v. Rodebaugh, 798 F.3d 1281, 1304 (10th Cir. 2015). In other words, "[h]aving induced the [district] court to rely on a particular erroneous proposition of law or fact, a party . . . may not at a later stage . . . use the error to set aside the immediate consequences of the error." United States v. DeBerry, 430 F.3d 1294, 1302 (10th Cir. 2005) (quotation marks omitted).

In this case, Mekaeil filed a timely motion to suppress and Amador was allowed by the district court to join in that motion. The suppression motion began by asserting that the law enforcement officers violated defendants' Fourth Amendment rights by entering Room 150 without a warrant. The motion in turn asserted that exclusion of the evidence seized from Room 150 was "a necessary remedial measure." ROA, Vol. I at 39. In support of this latter argument, the motion asserted, citing in part this court's decision in United States v. Sims, 428 F.3d 945 (10th Cir. 2005), that the application submitted in support of the search warrant for Room 150,

_____

[4] Although the government has not expressly argued that we should apply the invited error doctrine, it has argued that defendants waived their argument regarding the first prong of the Murray test by failing to assert that argument below. And, in any event, we may *sua sponte* apply the invited error doctrine. United States v. Mancera-Perez, 505 F.3d 1054, 1057 n.3 (10th Cir. 2007).

16

setting aside the observations made by the law enforcement officers during their two illegal entries into Room 150, lacked sufficient information to provide probable cause for issuance of the warrant. [5]  Id. at 40-41.  Lastly, the motion asserted that "without the warrant," the government could not establish "that the evidence from the search of [R]oom 150 would have been inevitably discovered, or discovered through independent means, or that such evidence was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."  Id. at 43.  At no point did the motion discuss in detail the independent source doctrine, cite to Murray, or argue that the law enforcement officers would not have sought a search warrant absent their illegal entries into Room 150.  Thus, in sum, the defendants, consistent with our decision in Sims, asked the district court to resolve their suppression motion simply by examining the search warrant application and deciding whether, absent the observations made by the law enforcement officers in Room 150, it contained sufficient information to provide probable cause for issuance of the search warrant.

The government, in its written response to the defendants' motion to suppress, argued that exigent circumstances existed that justified the officers' warrantless entries into Room 150.  Alternatively, the government argued, citing primarily Sims,

---

[5] In Sims, this court dealt with a situation where an arrest warrant and search warrants obtained to search the defendant's office, home computer, and computer disks seized from his luggage all relied in part on fruits from an earlier illegal warrantless search of the defendant's office.  In addressing this situation, this court stated: "When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information."  428 F.3d at 954.

that setting aside the information observed by the officers during their warrantless entries into Room 150, the search warrant application still contained sufficient information to provide probable cause for the issuance of a search warrant. Lastly, the government argued that even if probable cause was lacking, "the search should be upheld under the good faith exception recognized in United States v. Leon, 468 U.S. 897 (1984)." ROA, Vol. I at 57.

Defendants filed no reply brief. At the suppression hearing, neither the parties nor the district court mentioned Murray or the independent source doctrine. Instead, the district court repeatedly mentioned the inevitable discovery doctrine.[6] Amador ROA, Vol. 3 at 114-15, 122-23, 129, 132-34.

When the district court issued its written decision denying the motion to suppress, it did not mention the independent source doctrine, cite to Murray, or consider whether the officers would have sought a search warrant absent their illegal entries into Room 150. Instead, citing Sims, the district court analyzed the search warrant application and concluded that, even setting aside the information that was derived from the officers' illegal entries into Room 150, the warrant contained sufficient information to provide probable cause for issuance of the search warrant. In short, the district court agreed with defendants that the officers illegally entered

---

[6] "The inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." Strieff, 136 S. Ct. at 2061. Thus, the inevitable discovery doctrine requires a court to consider a hypothetical, i.e., would law enforcement officers have found the evidence at issue independently of the illegality.

18

Room 150, but it disagreed with defendants that, setting aside the observations made by the officers during their illegal entries, the search warrant application lacked sufficient information to provide probable cause of the issuance of a search warrant for Room 150.

In light of these circumstances, we conclude that defendants induced the district court to consider only the second prong of the <u>Murray</u> test, and thus the invited error doctrine precludes our review of defendants' argument that the district court failed to consider the first prong of the test outlined in <u>Murray</u>, i.e., whether the law enforcement agents' decision to seek the search warrant was prompted by what they had seen in Room 150 during their illegal entries.

III

The judgment of the district court is AFFIRMED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge