**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| A.L., | : | No. 57 MAP 2021 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court dated March |
| | : | 8, 2021 at No. 674 CD 2020 |
| v. | : | Reversing the Order of the |
| | : | Pennsylvania State Police at No. |
| | : | PSP-2019-SLAP-000814 dated June |
| PENNSYLVANIA STATE POLICE, | : | 30, 2020. |
| | : | |
| Appellant | : | ARGUED:  March 10, 2022 |

**OPINION**

JUSTICE MUNDY                                          DECIDED:  May 17, 2022

We allowed appeal in this matter to determine whether sexual assault as defined under the Uniform Code of Military Justice is comparable to sexual assault as defined under the Pennsylvania Crimes Code so as to make Appellee a lifetime Megan's Law registrant.

In 2013, while in the Navy, Appellee had intercourse with the adult victim when her ability to consent was impaired by alcohol.  He was charged with sexual assault under the Uniform Code of Military Justice, which defines the offense, in relevant part, as:

> (3) commit[ting] a sexual act upon another person when the other person is incapable of consenting . . . due to (A) impairment by any drug, intoxicant, or other similar substance, and that condition *is known or reasonably should be known* by the person[.]

10 U.S.C. § 920(b)(3)(A) (emphasis added).

Appellee was tried by general court-martial, with a panel of service members acting as fact-finders. The panel returned a verdict of guilty which was recorded on a military form (essentially a verdict slip) stating the victim's condition "was known or reasonably should have been known by" Appellee. N.T., Dec. 5, 2019, at Exh. PSP-1, *reprinted at* RR. 108a. Appellee was sentenced to sixty days' confinement, a reduction in rank, and a dishonorable discharge. He appealed to the United States Navy-Marine Corps Court of Criminal Appeals, which affirmed the conviction and sentence. *See United States v. [A.L.]*, 2015 WL 5610560, at *1 (N-M. Ct. Crim. App. Sept. 24, 2015). After his discharge from the Navy, Appellee moved to Pennsylvania. He registered with the Pennsylvania State Police ("PSP") as a sex offender subject to registration under Megan's Law IV, also referred to as the Sexual Offender Registration and Notification Act ("SORNA"). *See* 42 Pa.C.S. § 9799.13(1) (relating to who must register).

By way of brief statutory background, as to crimes committed on or after December 20, 2012, SORNA sets forth a three-tier classification system appearing in Subchapter H of the Sentencing Code to specify the length of a sex offender's registration. Individuals convicted of a Tier I offense are obligated to register for 15 years, those convicted of a Tier II offense must register for 25 years, and persons convicted of a Tier III offense are subject to lifetime registration. *See id.* § 9799.15(a); *see also Commonwealth v. Lacombe*, 234 A.3d 602, 611 (Pa. 2020) (describing this legislative scheme); *Commonwealth v. Torsilieri*, 232 A.3d 567, 580-81 (Pa. 2020) (discussing Subchapters H and I of the Sentencing Code). Each tier lists predicate offenses defined under Pennsylvania's Crimes Code, and each tier states that "comparable" military offenses are also included in that tier.[1]

---

[1] In full, those provisions indicate the respective tier includes "[a] comparable military offense or similar offense under the laws of another jurisdiction or country or under a former law of this Commonwealth." 42 Pa.C.S. §§ 9799.14(b)(21), (c)(17), (d)(13).

In light of the above, PSP undertook to determine Appellee's registration tier. To do this, it sought to ascertain the enumerated Pennsylvania crime to which the military offense was comparable. PSP eventually concluded the military offense was comparable to sexual assault under the Crimes Code, which is committed when a

> person engages in sexual intercourse . . . with a complainant without the complainant's consent.

18 Pa.C.S. § 3124.1.[2] As the above is a Tier III offense, PSP notified Appellee he was a lifetime registrant under SORNA. Appellee appealed, arguing PSP's action was adjudicative and not merely ministerial. As such, he contended PSP violated his procedural rights by not holding a hearing. The Commonwealth Court agreed, and it directed PSP to afford Appellee adequate process. *See [A.L.] v. PSP*, No. 587 M.D. 2016, 2019 WL 3102125, at *6 (Pa. Cmwlth. July 16, 2019).

On remand, PSP convened an administrative hearing at which the commander of PSP's Megan's Law Section testified to his belief that A.L.'s conviction under 10 U.S.C. § 920(b)(3)(A) was comparable to sexual assault as defined by 18 Pa.C.S. § 3124.1.

In his proposed report, the hearing officer agreed and he opined that, although Section 3124.1's *mens rea* requirement does not encompass negligent conduct, the two offenses are nonetheless equivalent. In this respect, the hearing officer concluded Appellee did, in fact, know of his victim's impaired condition. To support this conclusion, the hearing officer pointed to a passage in the opinion issued by the military appellate court in which that tribunal remarked the record contained compelling evidence Appellee

---

[2] This definition does not include the "reasonably should be known" – *i.e.*, negligence – language appearing in the military offense, thereby reflecting a different minimum *mens rea*. In particular, because no scienter is specified as to the victim's non-consent, it defaults to at least recklessness under 18 Pa.C.S. § 302(c) ("When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto."). That difference lies at the heart of this dispute and is discussed below.

"was aware of [the victim's] intoxicated state and intentionally acted to take advantage of her incapacitated condition." *[A.L.]*, 2015 WL 5610560, at *3.

The hearing officer additionally observed the enumerated Tier III offenses involving intercourse generally arise where the victim is unconscious, is otherwise unaware of what is occurring, is mentally disabled, has refused consent, or is physically incapable of communicating an unwillingness to participate. By contrast, he continued, Tier I and Tier II offenses involving intercourse tend to be predicated on the status of the victim, such as where the victim is underaged, a child receiving services at a center for children, a student at the school where the defendant works, or an individual being confined in (or supervised by) an institution where the defendant works. Thus, the hearing officer concluded that, because the Tier I and Tier II offenses do not involve the victim's refusal to consent or inability to consent, they are not comparable to the military offense in question.

The hearing officer attached a proposed order affirming PSP's initial determination that Appellee was convicted of a Tier III offense.

Appellee filed exceptions, asserting, *inter alia*, his conviction may have been based on mere negligence, and hence, the hearing officer erred in relying on the appellate court's commentary on the evidence as establishing the requisite *mens rea* for guilt under the Pennsylvania offense. He pointed out his sentence of confinement was only sixty days and, as such, it is plausible the court martial which returned the actual conviction found he had acted negligently. Appellee added that, at a minimum, any doubt on this topic should be resolved in his favor under established legal precepts.

PSP overruled Appellee's exceptions and adopted the proposed report and order as its own final adjudication. Appellee appealed to the Commonwealth Court.

That court reversed in a published opinion, finding the two offenses are not comparable. The court reasoned the military offense encompasses negligent conduct,

which could have been the basis for Appellee's conviction, whereas the Pennsylvania crime requires a reckless mental state or above. *See supra* note 2. Therefore, the court held the military offense could not be the basis for a Tier III classification under SORNA. *See A.L. v. PSP*, 247 A.3d 120, 128-29 (Pa. Cmwlth. 2021).

We granted PSP's petition for allowance of appeal in which the following questions were framed for our review:

> 1. When comparing a military criminal offense to a Crimes Code offense pursuant to 42 Pa.C.S. § 9799.14(b)(21), (c)(17), or (d)(13), is the Pennsylvania State Police required to ensure that all of the elements of crimes, including the *mens rea*, are equivalent?
>
> 2. If the Pennsylvania State Police is required to consider the *mens rea* when comparing a military criminal offense to a Crimes Code offense pursuant to 42 Pa.C.S. § 9799.14(b)(21), (c)(17), or (d)(13), should the *mens rea* requirement only be considered a factor when making the determination?

*A.L. v. PSP*, 260 A.3d 920 (Pa. 2021) (*per curiam*).

The need to compare two criminal offenses, one in-state (the "reference offense") and the other out-of-state (the "offense of conviction"), raises the question of how that comparison should be made and how the reviewing court – or the administrative agency as in the present case – should determine whether the answer is "yes" they are comparable, or "no" they are not comparable. Our intermediate appellate courts have addressed this issue in several reported decisions.

In *Shewack v. PennDOT*, 993 A.2d 916 (Pa. Cmwlth. 2010), the court held that, when comparing an out-of-state offense to a Pennsylvania offense to determine whether they are "essentially similar" – so that a conviction of the out-of-state offense disqualifies the individual from holding a commercial driver's license in Pennsylvania for one year – "the comparison is between the elements of the foreign state's statute and the elements of Pennsylvania's statute." *Id.* at 919. Although the Maryland and Pennsylvania statutes

in that matter prohibited driving with a suspended license, the court found they were not essentially similar because the Pennsylvania law specifically prohibited driving a commercial vehicle with a suspended commercial driver's license, whereas the Maryland law was broader in that it precluded driving virtually any type of vehicle with suspended privileges. The underlying concept was that, where the elements of the offense of conviction cover a broader range of conduct than the elements of the reference offense, the two are not "essentially similar." Notably, applying the same test, the Commonwealth Court reached the opposite conclusion in *Aten v. PennDOT*, 649 A.2d 732 (Pa. Cmwlth. 1994), where the reference offense of driving a commercial vehicle without holding or being in immediate possession of a valid commercial driver's license was compared to West Virginia's counterpart – which, unlike the Maryland law, applied specifically to commercial vehicles.

This comparison-of-the-elements method has also been used by the Superior Court. In *Commonwealth v. Whisnant*, 568 A.2d 259 (Pa. Super. 1990), the court affirmed a DUI sentence enhancement based on two prior New Jersey convictions for an equivalent DUI offense. The court found the elements of the offenses to be "substantially identical." *Id.* at 260. It reasoned that, even though the New Jersey statute, unlike the Pennsylvania statute, stated in the alternative that a defendant was guilty of DUI if he allowed another intoxicated person to drive his (the defendant's) car, that aspect of the New Jersey statute was immaterial because it was clear that was not the basis for the defendant's out-of-state convictions. *See id.* at 261.

These decisions demonstrate that gauging offense similarity or equivalency has generally been accomplished by comparing the elements of the out-of-state offense with those of the in-state offense. *Accord Freeman v. PSP*, 2 A.3d 1259, 1262 (Pa. Cmwlth. 2010) (comparing offense elements to determine whether a New York conviction

restricted the appellant's ability to possess firearms in Pennsylvania); *cf. Commonwealth v. Bolden*, 532 A.2d 1172, 1175-76 (Pa. Super. 1987) (expressing that, to calculate a prior-record score under the sentencing guidelines based on a foreign conviction, courts should identify the elements of the foreign offense and determine the equivalent Pennsylvania offense). If the elements are the same, or if the offense of conviction is narrower than the reference offense – meaning it captures a subset of the conduct of the reference offense – the two are comparable. If, however, the offense of conviction defines the crime in terms of alternative elements, the question becomes whether the offense of conviction was based on the same elements as defined under the Pennsylvania statute. *Whisnant* is an example of this: where the New Jersey DUI statute made it an offense to either drive while intoxicated or, alternatively, to allow another intoxicated person to drive one's vehicle, but the defendant's New Jersey convictions did not implicate that alternative basis for criminal liability, the New Jersey convictions were deemed equivalent to Pennsylvania DUI convictions. This approach to comparing offenses ensures that, to count as a predicate, the out-of-state conviction signifies the individual was found guilty in that jurisdiction of every element of the Pennsylvania offense. It has been endorsed by the United States Supreme Court for precisely this reason. *See Descamps v. United States*, 570 U.S. 254, 272 (2013).

In the Supreme Court's jurisprudence, the topic has often arisen in the context of the Armed Career Criminal Act, 18 U.S.C. § 924 ("ACCA"). That statute imposes a sentence enhancement upon defendants convicted under federal law of being a felon in possession of a firearm, where the defendant has three prior convictions for certain violent felonies. Under ACCA, the reference offense is referred to as the "generic" crime, meaning, the crime as commonly understood, *see Descamps*, 570 U.S. at 257; *Taylor*, 495 U.S. at 598-99 (referring to generic burglary as the way burglary is defined in the

criminal codes of most states); *Quarles v. United States*, 139 S. Ct. 1872, 1877 (2019), and the predicate convictions are usually at the state level. *But cf. Shular v. United States*, ___ U.S. ___, 140 S. Ct. 779, 782 (2020) (where the offense of conviction is a state-level "serious drug offense," the reference offense is not a generic crime, but the conduct specified in ACCA's definition of a serious drug offense).

To evaluate whether a prior state conviction counts as an ACCA predicate, the Supreme Court compares the elements of the generic crime with the elements under state law, a method it refers to as the "categorical approach." *Taylor v. United States*, 495 U.S. 575, 602 (1990). The sentencing court does not focus on the particular facts underlying the predicate conviction as to do so could entail an "elaborate factfinding process" that would be impractical, including where the conviction was based on a guilty plea. *Id.* at 601. The Court has articulated three reasons for choosing this approach: Congress made the sentence enhancement to depend on "convictions" not actions; any effort at fact-finding for sentencing purposes would be problematic under the Sixth Amendment; and "daunting" difficulties and inequities would arise from a sentencing court's effort at belated fact-finding based on aged documents, especially when their content is subject to interpretation. *See Descamps*, 570 U.S. at 267-71.[3]

With that said, the Supreme Court has also consistently recognized that some state offenses are defined by a "divisible" statute, meaning the statute gives alternative

---

[3] In terms of the inequities, the Court pointed out that at the criminal proceedings in state court, the defendant may have little incentive to correct errors that do not really matter in that context and may have good reason not to, as extraneous facts and arguments may confuse the jury. Similarly, during a plea hearing, "the defendant may not wish to irk the prosecutor or court by squabbling about superfluous factual allegations." *Id.* at 270. It would thus be unfair for a sentencing court, later on, to use uncorrected (but erroneous) statements by the prosecutor or judge as proof specific actions were taken in committing the offense. *See id.* at 269-70 (explaining the only facts the ACCA sentencing court can be sure the jury found are those constituting elements of the offense); *accord Mathis v. United States*, 579 U.S. 500, 512-13 (2016).

elements, usually phrased in the disjunctive, that could make up the offense. In such cases, the Court has approved what it calls the "modified categorical approach," allowing the sentencing court to "consult a limited class of documents" from the conviction record, such as indictments and jury instructions, to determine the alternative element, and thus, the alternative crime, of which the defendant was previously found guilty. *Id.* at 257; *see also Johnson v. United States*, 559 U.S. 133, 144 (2010) (indicating the court can consider charging documents, plea agreements, transcripts of plea colloquies, jury instructions, verdict slips, and findings of fact and conclusions of law from a bench trial); *Nijhawan v. Holder*, 557 U.S. 29, 35 (2009). Assuming the sentencing court can, in fact, determine from that limited set of documents the specific alternative crime of which the defendant was convicted, the court "can then do what the categorical approach demands: compare the elements of the crime of conviction (including the alternative element used in the case) with the elements of the generic crime." *Descamps*, 570 U.S. at 257. While this was first characterized as an "exception" to the categorical approach, *Shepard v. United States*, 544 U.S. 13, 17 (2005), the Court later clarified it was not an exception but a "tool" because it "retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime." *Descamps*, 570 U.S. at 263.[4]

Because SORNA is not a sentencing statute, the Sixth Amendment concerns identified in relation to ACCA are not in sharp relief. But the other two considerations

---

[4] The Supreme Court has been careful to distinguish alternative *elements* – which in reality define different crimes – from alternative *means* of satisfying a single element. It has clarified that the modified categorical approach is not applicable to different means, as in that instance the extra-jurisdictional offense sweeps more broadly than the generic one. As well, considering the means by which an element of the state offense was committed leads to the inequities described above. *See supra* note 3. *See generally Mathis*, 579 U.S. at 513 (recognizing the modified categorical approach serves only "as a tool to identify the elements of the crime of conviction when a statute's disjunctive phrasing renders one (or more) of them opaque").

motivating the categorical approach are: just as Congress determined ACCA sentencing enhancements should be based on prior convictions as opposed to prior actions, the duration of an individual's obligation to register under SORNA is likewise premised on whether that person has been "convicted" of a Tier I, II, or III offense. 42 Pa.C.S. § 9799.15(a). Additionally, any attempt by PSP to engage in fact-finding relative to the particular circumstances of the underlying offense could result in the types of inequities identified by the Supreme Court, *see supra* note 3, not to mention *ad hoc* and inconsistent outcomes. *See United States v. Wilson*, 951 F.2d 586, 390 (4th Cir. 1991) (suggesting a factual approach could devolve into "a series of mini-trials in which the defendant rehashes his version of the events that led to his predicate convictions and the prosecution searches for stale evidence to prove an element that was necessarily proved or admitted at the prior proceeding"). And it may be noted the Supreme Court applies the categorical approach in the civil context as well as criminal. *See Kawashima v. Holder*, 565 U.S. 478, 483 (2012) (using the categorical approach for deportation decisions).

PSP's main objection to this approach is that it does not allow PSP to fully implement its obligation to impose registration based on "comparable" military offenses. PSP understands the approach as requiring "identical" rather than "comparable" crimes which, it claims, does not fully comport with the statute. *See* Reply Brief for Appellant at 9-11. More generally, PSP contends the adjective "comparable" has enough leeway that the military offense does not need to be the same as, or a subset of, the Pennsylvania offense. PSP adverts to dictionary definitions of "comparable" which suggest mere similarity, or ability to be compared. It offers the analogy of comparable homes, a concept used in real-estate valuation. *See* Brief for Appellant at 15. PSP takes particular issue with having to compare scienter thresholds when assessing if two crimes are comparable.

*See* Brief for Appellant at 18 (arguing the General Assembly "did not intend for the PSP to ensure" the equivalency of "each and every element, to include *mens rea*").

To the extent PSP argues the object of our exercise in statutory interpretation is to give effect to legislative intent, and the best indication of that intent is the statute's plain text, we have no occasion to disagree. *See, e.g.*, *In re B.W.*, 250 A.3d 1163, 1170-71 (Pa. 2021). The difficulty in the present controversy arises from the use of the word "comparable" which, as PSP's real-estate analogy demonstrates, can be rather loose and subjective, as anyone who has reviewed a real-estate appraisal knows.

As PSP recognizes, the General Assembly has used variations on the theme of comparability in statutes addressing circumstances in which a person's conviction history is material in civil and criminal settings. These include such circumstances as the ability to obtain a commercial driver's license, the ability to possess firearms, the ability to be certified as an athlete's agent, DUI sentencing, whether a mandatory minimum sentence should apply under the three-strikes statute, and pension forfeiture, to name a few. In these instances, the General Assembly's policy toward out-of-state convictions is that they count as part of the relevant criminal history so long as the extra-jurisdictional offense is similar to a Pennsylvania predicate offense.

To express the concept of similarity in these arenas, the legislative body has used different adjectives such as "equivalent," "similar," "essentially similar," "comparable," and "substantially the same." *See* 18 Pa.C.S. § 6105(b) (encompassing "equivalent" offenses in relation to firearms possession); 75 Pa.C.S. § 1611(d) (including "similar" convictions relative to commercial driver's licenses); *id.* § 1611(h) (superseded) (referencing "essentially similar" offenses relative to commercial driver's licenses); 5 Pa.C.S. § 3304(c) (embracing "comparable" offenses as to athlete-agent certification); 75 Pa.C.S. § 3731(e)(1)(iii) (superseded) (referring to "equivalent" offenses for repeat-DUI

sentencing); 42 Pa.C.S. § 9714(g) (defining crime of violence to subsume "equivalent" crimes under prior Pennsylvania law or in another jurisdiction); 43 P.S. §1312 (basing pension forfeiture on "substantially the same" extra-jurisdictional offenses). Although the Crimes Code, SORNA Subchapter H, and the Statutory Construction Act all have definitional sections, *see* 18 Pa.C.S. § 103, 42 Pa.C.S. § 9799.12, 1 Pa.C.S. § 1991, they do not define terms such as "comparable" "equivalent," and "similar," and neither party suggests that a "comparable" military offense is a term of art. Thus, we consider the word's "common and approved" usage. 1 Pa.C.S. § 1903(a).

The dictionary defines "comparable" as capable of being compared, worthy of comparison, like or equivalent – as in "artists of comparable talent." WEBSTER'S NEW COLLEGE DICTIONARY 234 (3d ed. 2008). An on-line thesaurus suggests the word means "fairly similar so that comparison is reasonable," and it gives synonyms including similar, alike, close, and not unlike.[5] As for Merriam-Webster's thesaurus, it provides the following synonyms: akin, alike, analogous, cognate, correspondent, corresponding, ditto, like, matching, parallel, resemblant, resembling, similar, such, and suchlike.[6] It is evident PSP prefers the meaning conveyed by words like "resembling" and "fairly similar so that comparison is reasonable." *See generally State v. Wetrich*, 412 P.3d 984, 990 (Kan. 2018) (surveying various definitions of "comparable" and describing these kinds of words as terms which "more closely support the State's close-enough-for-horseshoes-and-hand grenades view of comparable"). We find that, in view of this variety of possible meanings for "comparable," the term is ambiguous – or at least "not explicit," 1 Pa.C.S. §1921(c) –

---

[5] *See* MacMillan Thesaurus, https://www.macmillanthesaurus.com/us/comparable, last viewed April 14, 2022.

[6] *See* https://www.merriam-webster.com/thesaurus/comparable, last viewed April 14, 2022.

thus warranting consideration of the factors set forth in the Statutory Construction Act. *See Nicole B. v. Sch. Dist. of Phila.*, 237 A.3d 986, 997 (Pa. 2020).

The occasion and necessity for this aspect of the statute, the mischief to be remedied, and the object to be attained, *see* 1 Pa.C.S. § 1921(c)(1), (3), (4), are all straightforward: to avoid any unfairness or harm to the public that would result if an offender were treated more leniently due to the fortuity that his or her prior conviction arose in a different jurisdiction. *Accord Whisnant*, 568 A.2d at 260-61. *See generally Bolden*, 532 A.2d at 1174-75 ("Fairness required that the prior record score include convictions . . . from other states and from the United States courts . . .. To do otherwise would have treated some defendants as first offenders merely because they had committed their crimes in another jurisdiction."). While one might argue this consideration weighs in favor of a fairly loose comparison along the lines of that suggested by PSP, it would remain problematic to implement that standard in practice without leading to inconsistent results. As the Kansas court observed in a related context:

> Allowing sentencing courts to utilize an imprecise, *ad hoc* comparison of out-of-state crimes to Kansas offenses . . . to enhance the current Kansas sentence promotes, rather than curtails, the disparate treatment of similarly situated persons that the [Kansas sentencing guidelines] sought to cure. Moreover, statutes fixing sentences that are so vague that the test for enhancement devolves into "guesswork and intuition" can run afoul of due process considerations.

*Wetrich*, 412 P.3d at 991 (citing *Johnson*, 135 S. Ct. at 2556-59 (finding the enhancement residual clause of ACCA unconstitutionally vague)). This concern is substantial, and it speaks to the Legislature's dual directives that reviewing courts should consider the consequences of a particular interpretation, 1 Pa.C.S. § 1921(c)(6), and presume the

General Assembly did not intend an unreasonable result, *see id.* § 1922(1). We find that the Kansas court's concern applies equally to tier selection under SORNA.[7]

Thus, to remove guesswork, inconsistency, and *ad hoc* agency decision-making, to promote the legislative focus on prior convictions rather than prior actions, and to foreclose the type of "daunting" difficulties and potential unfairness the Supreme Court pointed out would arise if a reviewing entity years later were to sift through voluminous aged documents to ascertain exactly what the SORNA registrant did (as opposed to what he was convicted of), we hold the categorical approach as described by the Supreme Court is to be applied when ascertaining whether a prior extra-jurisdictional offense is "comparable" or "equivalent" under SORNA Subchapter H. Consistent with the Supreme Court's explanation and terminology as outlined above, the categorical approach includes the "tool" that Court refers to as the "modified categorical approach."

We note as well that this approach takes into account all elements of the offenses being compared, including scienter. To the extent PSP's advocacy can be read to suggest scienter is of diminished importance, *see* Brief for Appellant at 18 ("Clearly, the General Assembly did not intend for the PSP to ensure that each and every element, to include *mens rea*, of a military offense and an enumerated offense in 42 Pa.C.S. § 9799.14 are equivalent."), we do not endorse such a view. For example, involuntary

---

[7] Federal courts of appeal in a number of circuits have applied the categorical approach to tier selection under the federal SORNA law, *see United States v. Morales*, 801 F.3d 1, 4-5 (1st Cir. 2015); *United States v. Berry*, 814 F.3d 192, 196 (4th Cir. 2016); *United States v. Young*, 872 F.3d 742, 746 (5th Cir. 2017); *United States v. Barcus*, 892 F.3d 228, 231-32 (6th Cir. 2018); *United States v. Walker*, 931 F.3d 576, 579 (7th Cir. 2019); *United States v. Cabrera-Gutierrez*, 756 F.3d 1125, 1133 (9th Cir. 2014); *United States v. White*, 782 F.3d 1118, 1130-35 (10th Cir. 2015), as have several United States District Courts in the remaining circuits, *see, e.g.*, *United States v. Church*, 461 F. Supp. 2d 875, 883 (S.D. Iowa 2020); *United States v. Marrero*, 2020 WL 6637584, at *2 (E.D.N.Y. Nov. 12, 2020); *United States v. Gilchrist*, 2021 WL 808753, at *4 (M.D. Pa. Mar. 3, 2021); *United States v. Phillips*, 2016 WL 5338711, at *2-*3 (M.D. Fla. Sept. 23, 2016).

manslaughter, *see* 18 Pa.C.S. § 2503(a), and first-degree murder, *see id.* § 2502(a), are both forms of criminal homicide, *see id.* § 2501, and they are drastically different crimes although they differ only in the actor's mental state. As for SORNA predicate offenses, the Sixth Circuit has emphasized the importance of the "intent" element in comparing two offenses under the categorical approach, *see Barcus*, 892 F.3d at 232-34, and there is no principled basis to view *mens rea* as a second-class citizen among the broad array of items that may be included within the definitional elements of an offense triggering SORNA registration.

Applying the categorical approach to this dispute, the only element on which the parties focus their advocacy is the defendant's scienter. Appellee submits that, by encompassing negligent conduct, the military crime sweeps more broadly than the state crime and, consequently, cannot be deemed "comparable" to it under the categorical approach. PSP's position is that the "knowingly" *mens rea* under the Crimes Code is captured by the military offense's requirement that the victim's impaired state must have been "known" by the victim. Brief for Appellant at 21. Thus, PSP in effect adopts the view that the military statute is divisible and, moreover, that Appellee was convicted of the more serious of the two crimes in that he was found to have had actual knowledge of the victim's impaired condition.[8]

To support this position, PSP appears simply to assume Appellee had such knowledge, *see A.L.*, 247 A.3d at 128 ("PSP's entire analysis . . . is based upon a presumption that [A.L.] was convicted because he 'knew' that the [victim] was intoxicated and, therefore, unable to consent."), although at times PSP also cites to trial testimony

---

[8] PSP goes farther and argues Appellee *could not* have been convicted absent a finding he knew of the victim's impairment. *See id.* at 24 ("Had the general court-martial found . . . that [Appellee] was mistaken as to believing his victim had consented . . . it would have had to acquit."). This is incorrect as 10 U.S.C. § 920(b)(3)(A) allows for culpability based on an unreasonable belief the victim had consented.

and draws inferences from it. For example, PSP references testimony given at the court-martial indicating Appellee spoke to the victim the following day, stating they had had protected sex the night before and urging her not to report the incident; PSP contends Appellee would only have made those statements if he was, in fact, aware she had been too intoxicated to consent to the encounter. *See* Reply Brief for Appellant at 2.

Initially, we find that, by using the word "or" – *i.e.*, by stating that liability arises if the victim's impaired condition "is known *or* reasonably should be known" by the defendant – the *mens rea* reflected in the military offense is divisible in that it allows for culpability if the defendant either knew of the victim's impaired state or reasonably should have known of it. This means PSP was authorized to consult such items as the charging document, plea agreements, transcripts of plea colloquies, jury instructions, and verdict slips, to see if it could ascertain Appellee's precise scienter level – and thus, the particular crime set forth in the military offense definition of which Appellee was convicted. As the Commonwealth Court pointed out, however, the record does not reflect that the court which heard the evidence made any finding that Appellee in fact knew that his victim was too impaired to consent. To the contrary, that tribunal's equivalent of a verdict slip tracks the statutory language as it records the panel's finding that the victim's impairment "was known or reasonably should have been known by" Appellee. It is true the military *appellate* court expressed its view that the proofs adduced at trial were sufficient to support a finding that Appellee knew of the victim's impairment. But the panel of fact-finders did not make any such finding. That being the case, PSP was not entitled to rely on the appellate court's commentary.

*A fortiori*, PSP was not permitted to rely on the notes of testimony and its own inferences drawn therefrom. For example, the fact-finders at the court-martial might have disbelieved the testimony currently emphasized by PSP and nonetheless returned a guilty

verdict based on other evidence. *See generally Commonwealth v. Johnson*, 231 A.3d 807, 818 (Pa. 2020) (recognizing that courts which "rely on a cold record" defer to the fact-finder's factual findings as the latter "hears witness testimony first-hand [and] is able to take into account not only the words that are spoken and transcribed, but the witnesses' demeanor, tone of voice, mannerisms, and the like"). Further, allowing such inferences to form the basis for tier selection by PSP administrators could open the door to the registrant arguing from the evidence he did not commit the crime charged notwithstanding the guilty verdict. *See United States v. Uhl*, 210 F. 860, 862-63 (2d Cir. 1914) (making a similar observation about immigration officials who purported to base an immigration decision on evidence presented at a foreign trial rather than on the conviction alone). Just as important, the trial transcript does not comprise one of the "limited class of documents," *Mathis*, 579 U.S. at 505, which PSP was allowed to consult per the modified categorical approach.

In sum, the military statute under which Appellee was convicted effectively defines two crimes, one when the victim's impairment is known to the actor, and the other when that impairment reasonably should be known but is not. *See* 10 U.S.C. § 920(b)(3)(A). PSP lacked a valid foundation to discern which of the two formed the basis for the military panel's finding of guilt. For present purposes, then, that statute "criminalizes a broader swath of conduct," *Descamps*, 570 U.S. at 258, than the predicate Pennsylvania offense defined by the Crimes Code, which, as noted, bases culpability on a *mens rea* of recklessness or above. *See* 18 Pa.C.S. § 3124.1 (containing no express *mens rea*, thereby defaulting to at least recklessness under 18 Pa.C.S. § 302(c)). As a consequence, the military offense is not "comparable" to 18 Pa.C.S. § 3124.1 for purposes of 42 Pa.C.S. § 9799.14(d)(13), and thus, Appellee's court-martial conviction cannot be the basis for his classification as a Tier III lifetime registrant under SORNA.

Accordingly, the judgment of the Commonwealth Court is affirmed.

Chief Justice Baer and Justices Todd, Donohue, Dougherty and Wecht join the opinion.

Justice Brobson did not participate in the consideration or decision of this matter.